**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Gabriel Antonio PINO,**
**Defendant-Appellant.**

No. 82–5941.

United States Court of Appeals, Eleventh Circuit.

April 16, 1984.

Rick S. Cullen, Asst. Federal Public Defender, Theodore Sakowitz, Federal Public Defender, and Tracye K. Solove, Kenneth E. Cohen and Charles G. White, Asst. Federal Public Defenders, Miami, Fla., for defendant-appellant.

Stanley Marcus, U.S. Atty., and Chris Mancino, Robert F. Dunlap, James G. McAdams and Linda Collins Hertz, Asst. U.S. Attys., Miami, Fla., for plaintiff-appellee.

Before RONEY, HATCHETT and ANDERSON, Circuit Judges.

RONEY, Circuit Judge:

Gabriel Antonio Pino was convicted of importation and possession of cocaine with intent to distribute in violation of 21 U.S.C.A. §§ 952(a) and 841(a)(1). Pino was caught attempting to smuggle cocaine across the border in his digestive tract. His appeal raising Fourth Amendment issues is one of several decided this day.[1] It is the only one of those cases in which a rectal search was made. A subsequent x-ray search revealed more contraband. On a motion to suppress, the district court held that the customs inspectors' search was based on reasonable suspicion and that Pino consented to the search. We affirm on the ground that the facts known to the customs agents were sufficient to support the amount of suspicion necessary to justify both the rectal search and the x-ray conducted here.

Pino flew into Miami International Airport from Bogota, Colombia. During primary customs inspection, a customs inspector observed that Pino was traveling alone and wearing inexpensive clothes. A search of his luggage and personal effects disclosed he was carrying only enough clothes for a short stay. The inspector also noted that his ticket had been purchased for cash. When asked where he bought the ticket, he said someone else had bought it for him.

The inspector then questioned Pino on the purpose of his visit to Miami. Pino responded that he was on a business trip to purchase parts for his television repair business, one of two businesses he owned in Bogota. Pino had $1,200 in cash on his person. Pino, however, was carrying no business cards, manuals, forms, or other business-related accouterments. When questioned where he planned to buy the television parts and what parts he intended to buy, Pino became evasive, saying he did not know. Pino had appeared unusually nervous and disoriented throughout the inspection, jerkily glancing here and there about him.

Suspecting that Pino was an internal carrier, the inspector advised his supervisor that he should be interviewed further. A customs agent then took over the questioning. He asked what type of televisions Pino sold and what parts he wished to purchase in Miami. Pino named several brands of televisions that he sold but was unable to name any part that he wished to purchase.

The agent also concluded that Pino was carrying drugs internally and he advised him of the *Miranda* rights. He then asked

1. No. 82–6037 *United States of America v. Padilla,* 729 F.2d 1357.
No. 82–5957 *United States of America v. Vega-Barvo,* 729 F.2d 1367.
No. 82–6056 *United States of America v. Henao-Castano,* 729 F.2d 1364.

No. 83–5006 *United States of America v. Mosquera-Ramirez,* 729 F.2d 1352.
No. 83–5064 *United States of America v. Castaneda-Castaneda,* 729 F.2d 1360.
No. 83–5278 *United States of America v. De Montoya,* 729 F.2d 1369.

Pino if he would consent to x-rays and a medical examination. Pino agreed and was transported to a local hospital. There, he signed a consent form for a physical examination, x-rays, and the 7 rectal probe. First, physician performed the rectal probe. It revealed a rubber-like pellet containing cocaine. The x-ray showed numerous similar objects in his intestinal tract. Pino later excreted 85 cocaine-filled pellets and 35 more were removed surgically. In all, over 700 grams of cocaine were seized.

After the rectal probe, the agents of course knew that Pino was an internal carrier. Even if probable cause was required for the x-ray, they had it. Probably a physically forced x-ray would have been justified at that point. *See United States v. Vega-Barvo*, 729 F.2d 1341 (11th Cir.1984). The issue in this case then is whether the customs inspector had sufficient suspicion to have a doctor conduct a physically unforced rectal examination.

It is well established that the amount of suspicion required to justify a particular search depends on the intrusiveness of that search. *United States v. Sandler*, 644 F.2d 1163, 1166 (5th Cir.1981). After applying this flexible test in *Vega-Barvo*, we held that the amount of suspicion needed for an x-ray search was the same as that required for a strip search. *Vega-Barvo*, 729 F.2d at 1345. A rectal probe is more intrusive than either a strip or x-ray search. *See Bell v. Wolfish*, 441 U.S. 520, 558, 99 S.Ct. 1861, 1884, 60 L.Ed.2d 447 (1979). It involves a physical touching of a very private part of the human body. *See Vega-Barvo*, 729 F.2d at 1346. Correspondingly, a greater amount of suspicion is necessary to justify a rectal exam.

In measuring the facts necessary to be known to the customs inspectors for a rectal search, we, of course, cannot singly look at the x-ray and strip cases to see if more is present here than was required in those cases. Just because the circumstances there would support an x-ray or strip search does not mean that they would not

be strong enough to permit a more intrusive search. We also recognize that there is a good deal of subjective judgment required in these cases. We are guided by the cases which hold, however, that the facts must be sufficient to raise the level of required suspicion in the minds of experts, those who have been taught how to make these judgments, and that the review should not be an *ad hoc* determination of whether those facts would arouse the suspicion of the court, or an inexperienced person. *United States v. Cortez*, 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981); *Brown v. Texas*, 443 U.S. 47, 52 n. 2, 99 S.Ct. 2637, 2641, 61 L.Ed.2d 357 (1979). What is necessary are facts as to the individual involved which would cause these inspectors to reasonably believe that contraband was being carried internally and would be revealed in a rectal search: an articulably, particularized suspicion as to the person, and a particularized suspicion as to the location of the drugs. *See Vega-Barvo*, 729 F.2d at 1349.

With this standard in hand, a review of the facts reveals the reasonableness of the customs agents' actions here. Pino initially aroused the suspicions of a customs inspector because like most other internal carriers whose appeals are decided today he was a South American who arrived alone from a drug-source country wearing inexpensive clothing. The customs inspectors who interviewed him developed articulably specific grounds for suspecting him of smuggling cocaine from his answers to their questions. When asked about the details of his asserted plan to buy television parts, Pino was at first evasive. Subsequent questioning revealed that he did not know anything about television parts. The decision to search in this case was based on the judgment of at least two experienced customs inspectors. When viewed in their totality, these facts support a finding of reasonable suspicion that Pino was carrying drugs internally.

The problem then becomes how to make the internal search. The manner of

this search is significant in determining its reasonableness. Pino consented to a physical examination that included a rectal search and x-rays. He was taken to a hospital. The search was performed by doctors. It was physically unforced. There was reasonable belief that the rectal search would reveal contraband because the inspectors' experience indicated to them that internal carriers were very apt to be carrying narcotics in the rectal area. Based on all the circumstances present here, we conclude that sufficient suspicion was present to carry out the more intrusive but physically unforced rectal search. From the discovery of narcotics there, all else follows. Neither the x-ray, which could have been conducted with even less level of suspicion, *United States v. Vega-Barvo,* 729 F.2d 1349 (11th Cir.1984), and the detention while the revealed contraband was excreted by natural body process, *see United States v. Mosquera-Ramirez,* 729 F.2d 1352 (11th Cir.1984), violated Pino's Fourth Amendment rights.

We recognize that the force of the seven cases decided today may well present the person entering the United States with somewhat of a *Hobson's* choice.[2] Once a particularized suspicion arises that you are an internal carrier, the agents can conduct a search sufficient to determine the accuracy of that suspicion, the type of search depending in part on what you consent to. In the absence of consent, the agents can detain you until nature reveals the truth or falsity of their suspicions. This is the reason, in our judgment, that the cases should not rest solely on whether there was a consent or waiver in a particular case. Consent may heavily influence the determination as to the reasonableness of the manner of the search, but it does not completely foreclose the question of whether it was constitutional to search in some manner. A *Hobson's* choice may render a consent to an otherwise unconstitutional search ineffective. *Bumper v. North Carolina,* 391

U.S. 543, 550, 88 S.Ct. 1788, 1792, 20 L.Ed.2d 797 (1968); *United States v. Walters,* 591 F.2d 1195, 1200 (5th Cir.) *cert. denied,* 442 U.S. 945, 99 S.Ct. 2892, 61 L.Ed.2d 317 (1979). But it may render valid a search that could not otherwise be physically forced. At the same time, we note that none of the cases decided today require us to face the reasonableness of a violent or physically forced search of the body.

AFFIRMED.

HATCHETT, Circuit Judge, concurring specially:

I concur specially in this case because the record shows that Pino consented to the searches.

---

**2.** A *Hobson's* choice only appears to be a choice. In reality it is not a choice at all because there is only one option to choose. The term derives from the practice of a liveryman named Thomas Hobson of requiring his customers to "choose" the horse closest to the door. *Webster's New World Dictionary* (2d College Ed. 1981).