**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Thomas Eddy McMURRAY,
Defendant-Appellant.**

No. 84–5278.

United States Court of Appeals,
Eleventh Circuit.

Dec. 5, 1984.

---

Charles G. White, Miami, Fla., for defendant-appellant.

Stanley Marcus, U.S. Atty., Roberto Martinez, Chris Mancino, Linda Collins Hertz, Asst. U.S. Attys., Miami, Fla., for plaintiff-appellee.

Before VANCE, HENDERSON and CLARK, Circuit Judges.

PER CURIAM:

Thomas Eddy McMurray was convicted in the United States District Court for the Southern District of Florida for importing cocaine in violation of 21 U.S.C. § 952(a), possession with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1), and introducing cocaine into a federal penal institution in violation of 18 U.S.C. § 1791 and the regulations promulgated thereunder.

On appeal, McMurray assigns as error the district court's denial of his motion to suppress the evidence of a quantity of cocaine discovered during a search of his artificial leg by customs inspectors, and the failure of the government to prove that he possessed the necessary intent to violate 18 U.S.C. § 1791.

On September 10, 1983, McMurray flew from Bogota, Colombia to Miami. At the Miami International Airport customs inspector Gloria Schwark noticed that McMurray limped and used a cane. When asked if he had injured his leg in Colombia, McMurray replied "no" and jumped back. According to Schwark, his actions seemed fearful.

Her suspicions aroused, Schwark questioned McMurray and was told that his uncle owned a resort in Colombia and that he had been vacationing in that country. His airplane ticket had been paid for in cash, and his passport indicated that he had gone to Colombia for two or three days at a time on four occasions in the last four months. McMurray's inexpensive luggage and clothes seemed inconsistent with the financial position of a person who made frequent and expensive trips to Colombia. Furthermore, McMurray had only four or five dollars in his possession, spoke in a whisper despite the fact he claimed to be a professional singer, appeared pale and nervous and kept backing away during her questioning.

Based on these facts Schwark summoned her supervisor, John Ryan, and requested a further search. Ryan escorted McMurray to a secondary search room where he and an associate discovered that McMurray had an artificial leg. McMurray refused Ryan's request that he remove his prosthesis and asked the reason for the request. Ryan replied that he suspected McMurray of carrying cocaine in the artificial limb. At this point McMurray became pale, began to hyperventilate and appeared agitated. In addition, McMurray expressed concern that the forcible removal of his artificial leg might damage it. After being moved to a larger, more comfortable room, McMurray removed the limb himself, declining an offer of medical assistance. The customs inspectors discovered a packet of cocaine in the thigh section of the leg. No attempt was made to further disassemble the prosthesis at that time.

After waiving his *Miranda* rights and admitting his guilt, McMurray was transported to the Metropolitan Correctional Center for incarceration pending arraignment. A search at the detention facility revealed an additional small quantity of cocaine in his cane. Later that day he was advised of the prison rules and regulations which included the proscription against bringing narcotics into a federal prison. A more thorough search of his prosthesis the next morning, September 11, revealed an additional cache of cocaine.

McMurray first contends that the original search of his artificial leg at the Miami airport was conducted in contravention of his Fourth Amendment rights. It is

well established that border searches are not subject to constitutional probable cause and warrant requirements. *United States v. Ramsey*, 431 U.S. 606, 619, 97 S.Ct. 1972, 1980, 52 L.Ed.2d 617, 628 (1977). In addition, Congress has granted customs inspectors broad authority to search and detain persons entering the United States from a foreign country. *See* 19 U.S.C. § 1582. Although this authority is limited by the reasonableness requirement of the Fourth Amendment, *see United States v. Villamonte-Marquez*, 462 U.S. 579, ——, 103 S.Ct. 2573, 2579, 77 L.Ed.2d 22, 30–31 (1983), "the Supreme Court has never decided what standard of reasonableness should be applied to body searches." *United States v. Vega-Barvo*, 729 F.2d 1341, 1344 (11th Cir.1984); *see Ramsey*, 431 U.S. at 618 n. 13, 97 S.Ct. at 1979 n. 13, 52 L.Ed.2d at 627 n. 13 (reserving the question).

■ This court "has applied this reasonableness requirement by adopting a flexible test which adjusts the strength of suspicion required for a particular search to the intrusiveness of that search. As intrusiveness increases, the amount of suspicion necessary to justify the search correspondingly increases." *Vega-Barvo*, 729 F.2d at 1344. The cases binding upon us which apply this sliding scale have established a "hierarchy of intrusiveness of searches." *Id.* A customs inspector's "mere suspicion" or "subjective response" is all that is necessary to justify minimally intrusive searches such as frisks or luggage inspec-

tions. *Id.* at 1345; *United States v. Sandler*, 644 F.2d 1163, 1167 (5th Cir.1981) (en banc).[1] A strip search requires a particularized "reasonable suspicion." *Id.; United States v. DeGutierrez*, 667 F.2d 16, 19 (5th Cir. Unit B 1982);[2] *United States v. Himmelwright*, 551 F.2d 991, 994–95 (5th Cir.), *cert. denied*, 434 U.S. 902, 98 S.Ct. 298, 54 L.Ed.2d 189 (1977). This standard is met "by a showing of articulable facts which are particularized as to the person and as to the place to be searched." *Vega-Barvo*, 729 F.2d at 1349; *see also United States v. Carter*, 590 F.2d 138, 139 (5th Cir.), *cert. denied*, 441 U.S. 908, 99 S.Ct. 2001, 60 L.Ed.2d 378 (1979); *Himmelwright*, 551 F.2d at 995. Highly intrusive searches such as body cavity examinations require an even greater degree of suspicion. *See United States v. Pino*, 729 F.2d 1357, 1359 (11th Cir.1984).

■ The scope of intrusiveness of a particular search, and thus the corresponding required quantum of suspicion, is determined in light of the (1) physical contact between the searcher and the person searched, (2) exposure of intimate body parts, and (3) use of force. *Vega-Barvo*, 729 F.2d at 1346. In this case, removal of the prosthesis involved no physical contact between the customs inspectors and McMurray, exposed no intimate body parts, and was not accomplished by force.[3] However, we do not decide in this appeal precisely where the search of an artificial limb falls along the sliding scale of reasonable suspicion.[4] Instead, we hold only that the

1. In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir.1981) (en banc), this court adopted as precedent all decisions of the former Fifth Circuit decided prior to October 1, 1981.

2. In *Stein v. Reynolds Securities, Inc.*, 667 F.2d 33, 34 (11th Cir.1982), the Eleventh Circuit Court of Appeals adopted as precedent all decisions of Unit B of the former Fifth Circuit.

3. McMurray argues that the search should be treated as if it were physically coerced because the customs officials obtained his cooperation only under a threat to forcibly remove it themselves. Brief of Appellant at 9–11. We find no evidence in the record of any threat. McMurray's argument appears to be based entirely on the fact that he voiced some concern during his

questioning about damage to his prosthesis. Record, vol. 2, pp. 31–32. Evidence of such a concern is insufficient to establish a threat. Accordingly, we do not address the effect of a threat to use force by customs officials on the degree of intrusiveness of a search.

4. This circuit has not yet confronted the amount of intrusiveness involved in a search of an artificial limb. We note, however, that two other circuits have indicated that such a search is not as intrusive as a body cavity examination. *See United States v. Sanders*, 663 F.2d 1, 3 (2d Cir. 1981); *United States v. Carter*, 563 F.2d 1360, 1361 (9th Cir.1977). We do not reach the question whether an artificial limb is a "body cavity."

unforced search of McMurray's prosthesis under the circumstances of this case was at least no more intrusive than an unforced body-cavity search which involves physical contact and exposure of intimate body parts. Because the degree of suspicion here would be sufficient to justify an un-coerced body-cavity search, we conclude that the search at issue before us was reasonable.

We recently considered body-cavity searches in *United States v. Pino,* 729 F.2d 1357 (11th Cir.1984), in the context of a physically uncompelled rectal examination. The measure of suspicion considered suffi-cient in *Pino* was based on the facts that the defendant was a South American, ar-rived alone from a drug-source country, was wearing inexpensive clothes, had brought only enough personal effects for a short stay, had purchased his airplane tick-et for cash, and gave evasive and inconsist-ent answers to questions about his employ-ment. In addition, "[t]here was reasonable belief that the rectal search would reveal contraband because the inspectors' experi-ence indicated to them that internal carri-ers were very apt to be carrying narcotics in the rectal area." *Id.* at 1360.

■ The amount of suspicion here, if anything, exceeds that in *Pino.* A particu-larized reasonable suspicion that McMur-ray was carrying narcotics was established by the facts that he was traveling alone; had little money; arrived from Colombia, a drug-source country; wore inexpensive clothing; carried cheap luggage; had pur-chased his ticket for cash; acted nervous and afraid; appeared pale; kept backing away when questioned; and had made four trips of two to three day duration to Colom-bia in the last four months. Also, the suspicion of the location of the contraband was adequately established not only by the expertise of customs inspectors, which was apparently adequate in *Pino,* but by the fact that when told he was suspected of carrying cocaine in his prosthesis McMur-ray turned pale and began to hyperventi-late.

In reaching our conclusion that the de-gree of suspicion in this case was adequate we are mindful of the general rule that "when used by trained law enforcement officers, objective facts, meaningless to the untrained, can be combined with permissi-ble deductions from such facts to form a legitimate basis for suspicion of a particu-lar person . . . ." *United States v. Cortez,* 449 U.S. 411, 419, 101 S.Ct. 690, 695–96, 66 L.Ed.2d 621, 629 (1981); *see Vega-Barvo,* 729 F.2d at 1350 (quoting *Cortez* ). In this instance, the search of McMurray's artifi-cial leg was reasonable within the meaning of the Fourth Amendment.

McMurray next urges that the govern-ment failed to prove the specific intent necessary to his conviction under 18 U.S.C. § 1791. That code section provides:

Whoever, contrary to any rule or regula-tion promulgated by the Attorney Gener-al, introduces or attempts to introduce into or upon the grounds of any Federal penal or correctional institution or takes or attempts to take or send therefrom anything whatsoever, shall be imprisoned not more than ten years.

18 U.S.C. § 1791. The applicable regula-tion states:

The introduction or attempt to introduce into or upon the grounds of any Federal penal or correctional institution or the taking or attempt to take or send there-from anything whatsoever without the knowledge and consent of the warden or superintendent . . . is prohibited.

28 C.F.R. § 6.1.

■ McMurray argues that a prerequi-site to a finding of liability under section 1791 and its regulation is proof that the defendant knew he was acting illegally when he introduced narcotics into a federal penitentiary. To fulfill this specific intent requirement he claims it is necessary that a defendant receive notice of which items, when transported into a federal prison, fall within the regulation's proscription. Be-cause he was not apprised of the specific prison rules prohibiting the introduction of narcotics into a federal prison until after he had been incarcerated and the discovery of

the cocaine in his cane, McMurray asserts that his conviction on that count cannot stand.

We need not address whether section 1791 requires actual knowledge of the proscribed items because we hold that even if it does, there was sufficient evidence that McMurray was notified of the rules and regulations prohibiting the introduction of cocaine into the prison. Although McMurray was apparently not told of the prison rules before he entered the penitentiary or before the September 10, 1983, search which disclosed cocaine in his walking cane, there is evidence that he was told of the rules later that day, and before the September 11, 1983, search of his artificial leg which uncovered the additional cocaine. Record, vol. 2, pp. 51–52. Nonetheless, McMurray did not disclose the presence of the narcotics discovered after notice had been given him of the prison rules, reasoning that the prison authorities failed to find it the first time, and that he would be better off if the additional contraband was not discovered. Record, vol. 2, p. 41. This second cache of cocaine provides sufficient grounds upon which to base McMurray's conviction under section 1791.

We reject the implication in McMurray's brief that a defendant must be informed of the rules prohibiting narcotics before he enters prison. Instead, we hold that if the defendant fails to surrender his contraband after he is informed of the prison rules prohibiting it there is sufficient evidence to establish the intent requirement of section 1791.

AFFIRMED.