**UNITED STATES of America,**
**Plaintiff-Appellee,**

**v.**

**William Eldridge CALDWELL,**
**Defendant-Appellant.**

**No. 84–2262.**

United States Court of Appeals,
Fifth Circuit.

Dec. 26, 1984.

Ralph E. Allen (Court-appointed), Tyler, Tex., for defendant-appellant.

Robert Wortham, U.S. Atty., Beaumont, Tex., Dane Smith, Tyler, Tex., for plaintiff-appellee.

Before THORNBERRY, GARWOOD and HILL, Circuit Judges.

THORNBERRY, Circuit Judge:

William Caldwell appeals his conviction for possession of marijuana[1] on the grounds that Federal Correctional Institution (FCI) officials subjected him to a digital rectal search that violated his fourth, fifth, and eighth amendment rights. Cald-well also contends that his right to due process was violated when certain FCI officials refused to be interviewed by his defense counsel after the Executive Assistant to the Warden advised them that they were not legally obligated to do so. Finally, he argues that the district court abused its discretion in denying his request to discover the identity of other inmates who had been subjected to digital searches. The district court referred Caldwell's Motion to Suppress and Motion to Dismiss to the United States Magistrate for consideration. After a hearing the magistrate made written findings and conclusions. The district court adopted the magistrate's findings and conclusions and denied Caldwell's Motion to Suppress and Motion to Dismiss. The court then tried and convicted Caldwell on the basis of Caldwell's testimony and stipulation of facts. We affirm.

## FACTS

At the time of the events in question Caldwell was confined to the Federal Correctional Institution, Texarkana, Texas. While confined to FCI Caldwell had developed a history of possession and use of narcotics. On January 9, 1982, an inmate informant told an FCI official that Caldwell would have narcotics concealed inside his rectum upon his return from the visiting room that day. The FCI official knew the inmate informant to be reliable. On the basis of the informant's tip the Warden's designee gave written authorization for a digital search.

After his visitation period Caldwell was brought before the Chief Correctional Supervisor and asked to execute a consent to the search. Caldwell refused, but was told that his consent was not required under prison regulations. Caldwell was then taken to the FCI Hospital where a physician's assistant again asked Caldwell to consent to the digital search. Caldwell refused. The FCI officials present then stripped Caldwell and held him to an examining table while the physician's assistant at-

---

1. Caldwell was convicted under 21 U.S.C. § 844(a). That statute provides that "[i]t shall be unlawful for any person knowingly or intentionally to possess a controlled substance."

tempted the digital search. Caldwell reacted violently and kicked the physician's assistant in the chest, knocking him against the wall. After a second attempt the physician's assistant said that he felt something inside Caldwell's rectum, but could not determine whether it was feces or foreign material. Caldwell's violent reaction prompted the FCI officials to call off the search. Their concern was that any further attempts at a digital probe might injure Caldwell.

After the failed digital search FCI officials placed Caldwell in a "dry cell" at the FCI Hospital. A "dry cell" is a room with no functioning plumbing by which an inmate might dispose of contraband. To assure that no contraband was present prior to placing Caldwell in the dry cell, FCI officials thoroughly searched the cell. Caldwell was kept under continuous observation while in the dry cell. After Caldwell had been in the cell for more than a day an official observed him jump from his bed and sit on the trash can. Immediately afterwards FCI officials retrieved five opaque balloons from the trash can. The FBI later found each balloon to contain marijuana.

Caldwell was thereafter convicted of possession of marijuana and sentenced to serve six months consecutive to the sentence he was already serving. On appeal Caldwell does not challenge the validity of the dry cell procedure. Rather, he contends that any evidence obtained through the dry cell procedure was fruit of the attempted digital search.

## I. Balloons not Fruit of the Poisonous Tree

Caldwell contends (1) that the digital search violated his fourth amendment right to be free from unreasonable searches, (2) that the five marijuana-filled balloons were a product of the digital search, and (3) that the exclusionary rule therefore dictates that the balloons should not have been admitted into evidence. We do not agree. Because we determine that the balloons were not a product of the digital search, we do not reach the question of the constitutionality of that search under the fourth amendment.[2]

"The exclusionary rule bars evidentiary 'fruit' obtained 'as a direct result' of an illegal search or an illegal coercive interrogation. [citations]. Its bar only extends from the 'tree' to the 'fruit,' however, if the fruit is sufficiently connected to the illegal tree." *United States v. Brookins*, 614 F.2d 1037, 1041 (5th Cir.1980). The test for determining whether evidence is "fruit of the poisonous tree" is "whether, granting the establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun v. United States*, 371 U.S. 471, 487–88, 83 S.Ct. 407, 417, 9 L.Ed.2d 441, *quoting* R. Maguire, Evidence of Guilt 221 (1959). The courts

---

**2.** We note, however, that in *United States v. Lilly*, 576 F.2d 1240 (5th Cir.1978), this Court expressly upheld a rectal search performed by FCI officials on the basis of an informant's tip.
> Although few searches are more intrusive than a body cavity search, we do not hold that such searches are per se unreasonable. [citations]. They not only help stem the flow of contraband into, within, and out of prisons, but they also have a beneficial deterrent effect. [citation]. To prove the legal validity of a particular body cavity search, however, the government still must show that the search and seizure in question was reasonable under all the facts and circumstances.

*Id.* at 1246. In addition, we note that the Supreme Court has recently held that "prisoners have no legitimate expectation of privacy and that the Fourth Amendment's prohibition on unreasonable searches does not apply in prison cells." *Hudson v. Palmer*, — U.S. —, —, 104 S.Ct. 3194, 3200, 82 L.Ed.2d 393 (1984). Although the *Hudson* case does not directly address the reach of the fourth amendment in prison body cavity search cases, it at least implies that the usual standards that apply to such searches outside the prison may be severely weakened inside the prison. Indeed, prisoners' rights often may be diminished by the needs and exigencies of the prison environment. *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).

have recognized three situations that fit the *Wong Sun* test for evidence "purged of the primary taint." *United States v. Parker,* 722 F.2d 179, 184 (5th Cir.1983). First, the exclusionary rule is inapplicable to evidence that has only an attenuated link to the illegally secured evidence. *United States v. Ceccolini,* 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978). Second, the exclusionary rule is inapplicable where the derivative evidence would inevitably have been discovered without the aid of illegally obtained evidence. *Brewer v. Williams,* 430 U.S. 387, 406 n. 12, 97 S.Ct. 1232, 1243 n. 12, 51 L.Ed.2d 424 (1977); *United States v. Brookins,* 614 F.2d 1037, 1044 (5th Cir. 1980). Third, the rule does not apply where the evidence derives from an independent source. *Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 392, 40 S.Ct. 182, 183, 64 L.Ed. 319 (1920); *United States v. Houltin,* 566 F.2d 1027 (5th Cir. 1978). We hold that the five balloons were properly admitted because they derived from a source independent from the digital search—namely, from the tip of a reliable informant and the use of the dry cell.

In *Silverthorne* the Supreme Court distinguished knowledge "gained from an independent source" from that gained by "the Government's own wrong." 251 U.S. at 392, 40 S.Ct. at 183. This distinction is the basis for the independent source exception to the exclusionary rule. For example, in *Houltin* this Court found that where the government knew the identity of four testifying codefendants before using an illegal wiretap, the testimony of the codefendants was admissible as derived from an independent source. 566 F.2d at 1031. Similarly, in *United States v. Fike,* 449 F.2d 191, 193 (5th Cir.1971), we concluded that:

> It is possible that "but for" the first search the police would not have taken the defendant into custody, and would not have conducted the second search which yielded the challenged evidence. However, assuming, but not deciding, that the first search was illegal, we hold that the evidence gained as a result of the second search, the only evidence of which defendant complains, was admissible. This is so because the voluntary consent of the defendant to the second search ... was an independent act sufficient to break the causal connection between the primary illegality and the evidence found as a result of the second search.

Our reasoning in this case is very similar to that of the Eighth Circuit in *United States v. Fanello,* 662 F.2d 505 (8th Cir. 1981). In that case the court found that "[n]othing that was discovered in the illegal searches heightened or diminished the inference of probable cause raised when the officers observed plastic garbage bags in the rear of the truck." *Id.* at 504. In this case the magistrate found that "the five marijuana-filled balloons were not recovered as a result of a digital search—a search which was thwarted by Caldwell's violent efforts in defending himself against such a search." The magistrate's determination of "the significance of the nexus between an [allegedly] illegal search and challenged evidence is one of common sense, ... to be considered under the facts and circumstances of the particular case." *Williams v. United States,* 382 F.2d 48, 51 (5th Cir.1967). We agree with the magistrate's conclusion.

The FCI officials performed the digital search on Caldwell on the basis of a tip from a reliable informant. Caldwell violently resisted the search, and after two attempts the officials called it off. The only information gained from the search was the physician's assistant's statement that he could feel something, but was not sure whether it was feces or foreign material. That statement is ambiguous at best and did nothing to heighten the inference of probable cause raised by the informant's tip. Indeed, the tip alone was sufficient cause to employ the dry cell procedure. That an unsuccessful digital search, which the defendant alleges was illegal, preceded placing the defendant in the dry cell does not affect the validity of the dry cell procedure. The five balloons derived directly from the informant's tip and the dry cell

procedure and not from the attempted digital search.

## II. *Due Process*

██ Caldwell contends that the FCI officials failed to follow applicable prison regulations in performing the digital search and that such failure acted to deny him due process. We agree, however, with the magistrate's conclusion that "the attempted digital search was conducted in accordance with FCI regulations and without the excessive use of force," and, therefore, we hold that Caldwell was not denied due process.

The regulations in question provide that FCI officials "shall employ the least intrusive method of search practicable, as indicated by the type of contraband and the suspected method of introduction." 28 C.F.R. § 552.10. The regulations then enumerate and define a number of types of searches, including digital and x-ray searches. 28 C.F.R. §§ 552.11(c) and 552.-12(b). Caldwell contends that the FCI officials failed to use the least intrusive method practicable when they attempted a digital search instead of using the dry cell procedure or x-ray examination. In essence, he argues that whenever an inmate is suspected of carrying contraband in his rectum, FCI officials are obligated to use the dry cell or x-ray since those procedures are less intrusive than the digital search. This construction, however, is not consistent with the regulations.

The dry cell procedure is nowhere mentioned in the regulations. It is illogical to assume that the drafters of the regulations would expressly provide for digital searches, make no mention of the dry cell, but nevertheless intend that the dry cell procedure be preferable. Furthermore, the dry cell procedure is potentially much more time consuming than the digital search since it requires that the inmate be kept under continuous observation.

The regulations provide that FCI officials use the least intrusive means *"practi-*

*cable, as indicated by the type of contraband and the method of suspected introduction"* (emphasis ours). This language indicates that when selecting a search method FCI officials have some discretion to consider the efficaciousness of alternative methods in the particular circumstances. Here the officials chose to attempt a digital search, a procedure expressly provided for in the regulations. That search was performed in accordance with the regulations. When it became apparent that Caldwell might be injured due to his violent reaction to the search the officials opted for the dry cell. We hold that this course of conduct is in all respects in conformity with the applicable regulations.

Caldwell's argument that an x-ray is less intrusive than a digital search is not borne out by a close reading of the regulations. Under the regulations, a digital search may be conducted (1) only by qualified health personnel (including nurses and physician's assistants), (2) only upon the consent of the Warden or Acting Warden, and (3) only if the Warden or Acting Warden has a reasonable belief that an inmate is concealing contraband in or on his body. 28 C.F.R. § 552.11(c). An x-ray examination, on the other hand, may be performed only where (1) there exists no reasonable alternative, (2) the examination is necessary for the security, good order, or discipline of the institution, and (3) the Warden's decision to authorize the institution's physician to order the examination is approved by the regional director. 28 C.F.R. § 552.12(b). Clearly, the prerequisites for using an x-ray examination are more stringent than those for a digital search. This implies that within the structure of the regulations the digital search is the favored procedure and is considered less intrusive than the x-ray examination. Moreover, even a finding that the digital search is in fact more intrusive than the x-ray examination would not raise the FCI officials' conduct to constitutional dimensions.[3] Here we ask only

---

**3.** For example, the Eleventh Circuit recently upheld a rectal search by customs agents even though it found that an x-ray examination was less intrusive. *United States v. Pino,* 729 F.2d 1357, 1359–60 (11th Cir.1984). The court correctly noted that the relative intrusiveness of

whether the FCI officials acted in accordance with the applicable regulations, and the answer must be in the affirmative.

■ Caldwell also contends that this Court should call upon its supervisory powers to reverse and bar his conviction on the grounds that the conduct of the FCI officials is so outrageous that due process principles would absolutely bar the government from invoking judicial process to obtain a conviction. *See United States v. Russell*, 411 U.S. 423, 431–32, 93 S.Ct. 1637, 1642–43, 36 L.Ed.2d 366 (1973); *Rochin v. California*, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952). After reviewing the record and pertinent case law we conclude that Caldwell's contention has no merit. We can find nothing in the record to suggest that the officials' conduct even approached the constitutional proportions Caldwell suggests.

■ Likewise, we cannot accept Caldwell's contention that the digital search constituted cruel and unusual punishment under the eighth amendment. The government has a legitimate penological interest in performing such searches to prevent the introduction of contraband into the institution. The regulations require that the search be conducted only if it does not endanger the inmate, and the evidence is clear in this case that the search was called off when the possibility of injury arose. Furthermore, there is no indication that the officials used unnecessary force in attempting the search.

### III. *Defense had no Right to Interview FCI Officials*

Caldwell contends that this Court should invoke its supervisory powers to reverse his conviction on the grounds that the refusal of certain FCI officials to be interviewed by his defense counsel constituted a deprivation of his fifth amendment right to due process. After Caldwell's indictment, his attorney telephoned Gary Youngblood, who had once been Caldwell's case manager at the prison, in an effort to arrange interviews with some of the FCI officials involved in the case. Subsequently, the Executive Assistant to the Warden circulated a memorandum to the officials, stating in part:

> at this juncture you are not legally obligated to talk with [Caldwell's attorney], but request [sic] that you so indicate by signing below and returning to me by August 11, 1982.

The officials signed the memorandum and refused to talk with Caldwell's attorney. The magistrate concluded that

> [w]hile the conduct of F.C.I. officials in their communication and dealing with [Caldwell's attorney], in his attempt as court appointed attorney to investigate the matter, was less than desirable; such conduct does not call for sanctions by this Court.

■ It is well established that "a government witness who does not wish to speak to or be interviewed by the defense prior to trial may not be required to do so." *United States v. Benson*, 495 F.2d 475, 479 (5th Cir.1974); *United States v. Dryden*, 423 F.2d 1175 (5th Cir.), *cert. denied*, 398 U.S. 950, 90 S.Ct. 1869, 26 L.Ed.2d 290 (1970). For example, in *Dryden* we held that the treasury agent's statement to the defendant and his attorney that they could interview a government witness only in the presence of the state or federal district attorney did not amount to a constitutional interference with the defendant's interviewing of the witness. 423 F.2d at 1177–78. Moreover, in *United States v. Rice*, 550 F.2d 1364 (5th Cir.), *cert. denied*, 434 U.S. 954, 98 S.Ct. 479, 54 L.Ed.2d 312 (1977), we drew a distinction between the defendant's right to mere access to a wit-

---

alternative permissible search methods goes only to the amount of suspicion required to justify the use of a particular method. *Id.* at 1359. "Just because the circumstances ...

would support an x-ray or strip search does not mean that they would not be strong enough to permit a more intrusive search." *Id.*

ness and an alleged right to interview a witness:

> All that a defendant is entitled to is *access* to a prospective witness. This right, however, exists co-equally with the witness' right to refuse to say anything.

Similarly, in *United States v. Brown*, 555 F.2d 407 (5th Cir.1977), *reh. denied*, 559 F.2d 29 (5th Cir.1977), *cert. denied*, 435 U.S. 904, 98 S.Ct. 1448, 55 L.Ed.2d 494 (1978), we approved a procedure whereby, if the attorneys for the defense wished to interview any of the government's witnesses, they were required to call a deputy clerk, who would contact the witness and advise him that he had the right to refuse the interview.

In this case, Caldwell's case manager and the Executive Assistant to the Warden did not close off defense counsel's access to the FCI officials. Rather, they merely informed the officials of their right to refuse to say anything to Caldwell's attorney. We agree with the magistrate that this did not amount to a constitutional violation.

## IV. *Discovery*

Finally, Caldwell contends that the district court abused its discretion in denying his request to discover information concerning other digital searches at the prison. The government's response is that Caldwell failed to make the required showing of materiality. Fed.R.Crim.P. Rule 16. Caldwell sought to discover the identity of other inmates who had been subjected to digital searches. He asserts that this information would have allowed him to ascertain whether he was singled out, verify whether confinement to a dry cell was feasible, and determine the success rate of procedures used. We agree with the government that Caldwell failed to make a showing of materiality, and, therefore, we hold that the district court did not abuse its discretion in denying Caldwell's request for discovery.

AFFIRMED.