**Rhonda BRENT, Plaintiff,**

v.

**UNITED STATES of America and Odesta Ashley, Carl Pietri, Francine Williams, Ricky R. Grim, Luis Sanchez, Kathryn Dellane, Prospero Ellis, Lee Sanchez–Blair and Seymor Schor, Defendants.**

No. 94–0646–CIV–FERGUSON.

United States District Court,
S.D. Florida,
Ft. Lauderdale Division.

Aug. 2, 1999.

Suzan Cardwell, L. Obii Aham–Neze, Houston, TX, for plaintiff.

Lawrence Nathan Rosen, Miami, FL, for defendants.

## CORRECTED MEMORANDUM OPINION ON QUALIFIED IMMUNITY

FERGUSON, District Judge.

This civil rights case is based on allegations of conduct by United States Customs inspectors in the performance of their official duties which a jury could find outrageous.

Proceeding from no more than a race-based "profile" and vindictiveness because of her silent reaction to the treatment of another African traveler, they subjected the plaintiff, an African–American female, to an unreasonable seizure and search for drugs. Included in the ten hours of inconveniences and indignities which followed were (1) removal from her scheduled flight, (2) being forced to lift her skirt and drop her panties, (3) removal and testing of her sanitary napkin, (4) a request to monitor her urination and bowel movements, (5) a visual inspection of her vaginal and anal cavities in an airport room that provided little privacy, (6) being jeered and cursed, (7) handcuffing and transporting her to the prison ward of a hospital for pelvic region x-rays, and (8) a threat to detain her for a prolonged period unless she executed a consent form for the x-rays. The Nigerian man and Brent were the only black persons on the flight.

The cause came before the court on the defendants' motion for summary judgment based on qualified immunity. They claim that the discretionary duties they were performing as government officials did not violate clearly established statutory or constitutional rights of which a reasonable person would have known. On the facts considered in a light most favorable to the plaintiff, a jury question is presented as to some of the inspectors. Judgment as a matter of law is granted to some and denied as to others.[1]

### Factual Background

On July 20, 1991 Rhonda Brent ("Brent"), returning from her first vacation overseas, arrived at Miami International Airport aboard Alitalia Flight # 618 at approximately 4:30 p.m. Brent had visited Nigeria and was returning to her home in Houston, Texas. During the Rome–Miami leg of the return flight, Brent briefly met Kehinde Elbute ("Elbute") a black native Nigerian man who was also en route to Houston. All passengers were directed to the customs area when the plane landed in Miami. As Brent entered the luggage pick-up area she noticed U.S. Customs Canine Enforcement Officer Ricky Grim ("Grim") and his canine inspection dog with Elbute. Brent asked Elbute why Grim was searching him and his carry-on

---

1. The office of the United States Attorney, which represents the defendants, has certified that "each of the named defendants was acting within the course and scope of their employment," and that "the United States should be substituted for individual defendants for the tort allegations" pleaded in Count II.

What is intended by the certification is not clear. The United States is not a named party to this action because its motion to dismiss, based on a failure to timely file under the Federal Torts Claim Act, was granted. No further motions to dismiss the individual defendants, or to dismiss the action because of the absence of an indispensable party, was filed within the time allowed by order of the court. Any defenses that should have been raised by motion have been waived.

The certification could be construed as an agreement to joinder of the United States pursuant to F.R. Civ. P. 19. It will be duly considered.

bag. Elbute replied that Grim wanted to see if he was carrying drugs.

Moments later, Brent, who is described as a large woman, picked up her luggage and headed towards the customs desk for routine inspection. She watched with disbelief as Grim removed and threw Elbute's clothing on the floor. Shaking her head in obvious disapproval of Elbute's treatment by Customs inspectors Brent continued walking towards the clearing sections.

Senior Inspector Seymor Schor ("Schor"), who had been watching Brent, thought her behavior was unusual. Coupling that behavior with her "loose fitting clothes" he concluded that she should be detained. Schor instructed Inspector Carl Pietri ("Pietri") to detain Brent and escort her to the examination area where Elbute had been taken. Pietri seized Brent's passport and other documents, isolated her from the other passengers, and took her to the examination area for interrogation. Brent immediately protested Pietri's actions as a violation of her rights alleging that she was being singled out because of her race.

In the examination area, Schor compared Brent's documents with Elbute's. Schor claimed that his interest was heightened when he noticed that both Brent and Elbute were destined for Houston; they were both returning from Nigeria, a known source country for drugs, and their tickets had been purchased at the same travel agency. Schor stated that "recent intelligence had uncovered information on attempts by Nigerian smugglers to use Afro–American females to smuggle drugs ... while pretending to be travelling separately." No source or evidence of reliability regarding the so-called "intelligence" is part of the record.

Schor, in Pietri's presence, questioned both Brent and Elbute and personally conducted a thorough search of every item in Brent's luggage. He found no drugs or items commonly associated with internal drug couriers such as toilet paper, lubrication creams, charcoal to absorb bowel acid, or drugs to suppress bowel movements.

Brent continued to protest the search and became increasingly agitated. Schor testified that he noticed her dry lips, shallow breathing and pulsating carotid artery, which became the basis for the next level of scrutiny.

At this point, Schor was joined by Supervisory Inspector Prospero Ellis ("Ellis"). Ellis also examined Brent's travel documents, clothing and luggage and observed her emotional reactions. For reasons which are not otherwise clear, Schor and Ellis concluded Brent was a likely internal carrier and decided to conduct a full body pat-down and strip search. Several female custom officers, Odesta Ashley ("Ashley"), Lee Sanchez–Blair ("Blair"), and Kathryn Dellane ("Dellane"), were called in to assist. Brent was told that her body would be searched for weapons and contraband.

The body pat-down and strip search, conducted by Blair and witnessed by Ashley and Dellane, consisted of touching her crotch area, ordering her to pull down her clothes, removing and examining her sanitary napkin, squeezing her abdomen from the pubis to thorax, peering into her rectal and vaginal cavities, monitoring her responsive reactions and the contents of her urine. Allegedly the search took place in a room with an open door and within view of persons passing in the hallway. Once again nothing was found to confirm the suspicion of carrying drugs internally: no rigid or distended abdomen; no girdle to hold up the abdomen, and no synthetic lubricants. No drugs could be seen in her body cavities or urine. Each progressively more intrusive search was negative. By this time Brent had become angry. At some point during the questioning, search and physical examination, Brent's name was entered into the Treasury Enforcement Computer Systems for frequent travels or arrests and again negative reports were received.

After the pat-down, physical examination, strip search, and electronic record search disclosed nothing Schor and Ellis

decided that an x-ray and pelvic examination at the hospital were justified. Dellane handcuffed Brent and transported her to Jackson Memorial Hospital. Brent inquired of Dellane why she was being subjected to further x-ray and pelvic examination and, allegedly, was informed that it was in order to "protect my children and co-worker's children from people like [you] who bring drugs into the country." Brent was then presented with a consent form and told that if she refused to sign it she could be held for 35 days or indefinitely until a judge ordered the x-ray. She requested to speak with an attorney and to call home. Both requests were denied. She signed the consent form and waived her Miranda rights only after being told she had no choice.

Upon arrival at the prison ward in Jackson Memorial Hospital, Brent says she was further humiliated by more degrading comments and was told to sign another consent form for the examination. Inspector Francine Williams ("Williams") arrived at the hospital to escort Brent to the x-ray room. Williams remained with Brent through the examination until arrangements were made for her return to the airport. At 3:00 a.m., after the hospital examination revealed a complete absence of drugs and over ten hours after she arrived in Miami, Dellane drove Brent back to the airport and assisted her in securing another flight home.

### Standard for Summary Judgment

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). A factual dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Similarly, a fact is "material" if it might affect the outcome of the suit under the governing substantive law. *Id.* at 247, 106 S.Ct. 2505.

In considering this motion for summary judgment, the Court must examine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that the defendant should prevail as a matter of law." *Id.* at 243, 106 S.Ct. 2505. The movant bears the initial burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In deciding whether the movant has met this burden, the Court must view the evidence and all factual inferences in the light most favorable to the nonmovant. *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1532 (11th Cir. 1992). "If reasonable minds could differ on the inferences arising from undisputed facts, summary judgment should be denied." *Id.* at 1534.

Once the initial burden is met, the nonmovant must come forward with specific facts showing that there is a genuine issue for trial that precludes summary judgment. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The evidence presented cannot consist of conclusory allegations, legal conclusions or evidence which would be inadmissable at trial. *Avirgan v. Hull*, 932 F.2d 1572, 1577 (11th Cir.1991). Likewise, "a mere scintilla of evidence supporting a position will not suffice; there must be enough of a showing that the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505. Failure to make a showing sufficient to establish the existence of any essential element of a claim is fatal and requires the entry of summary judgment. *Celotex Corp.*, 477 U.S. at 322–323, 106 S.Ct. 2548.

### Qualified Immunity

Determination of qualified immunity is a legal question, the answer dependent on the particular facts of the

case. *Sheth v. Webster*, 145 F.3d 1231, 1236 (11 Cir.1998). Enunciating the test for qualified immunity the United States Supreme Court held that "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). For a right to be "clearly established" for qualified immunity purposes, previous case law must have developed it in a concrete factual context so as to make it obvious to a reasonable government actor that his actions violate federal law. *Sanders v. Howze,* 177 F.3d 1245, 1999 WL 386302 (11th Cir.1999). Whether applicable law was clearly established at the time of the challenged action is determined by reference to decisions of the United States Supreme Court and the Court of Appeals for the Eleventh Circuit. *D'Aguanno v. Gallagher,* 50 F.3d 877, 881 n. 6 (11th Cir.1995). This standard is designed to protect "all but the plainly incompetent or those whom knowingly violate the law." *Burns v. Reed,* 500 U.S. 478, 480, 111 S.Ct. 1934, 114 L.Ed.2d 547 (1991).

## Intrusive Searches for Contraband

This discussion begins necessarily with a reference to the Fourth Amendment which provides that "The right of the people to be secure in their persons ... against unreasonable search and seizure shall not be violated ...." In many cases such as this one the courts, in deciding where the line is to be drawn, are admittedly balancing fourth amendment rights against the nation's war on drugs.

■■■■ The United States Supreme Court held that the "detention of a traveler at the border, beyond the scope of a routine customs search and inspection, is justified at its inception if custom agents, considering all the facts surrounding the traveler and her trip, reasonably suspect that the traveler is smuggling contraband in her alimentary canal." *United States v.* *Montoya de Hernandez,* 473 U.S. 531, 541, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985). The standard is one of "reasonable suspicion" and requires that the inspectors must have a particularized and objective basis for suspecting the particular person of alimentary canal smuggling. *Montoya de Hernandez,* 473 U.S. at 541, 105 S.Ct. 3304. Furthermore, the level of reasonable suspicion required to justify a search will increase according to the level of the search's intrusiveness. *United States v. Vega–Barvo,* 729 F.2d 1341, 1346 (11th Cir.1984), *United States v. Pino,* 729 F.2d 1357, 1359 (11th Cir.1984). To justify a more intrusive search it is necessary that facts as to the individual involved would cause trained inspectors to reasonably believe that contraband was being carried internally and would require "articulably particularized suspicion as to the person and particularized suspicion as to the location of the drugs." *Pino,* 729 F.2d at 1359.

The law in this Circuit as to what is required for an intrusive search has been settled for fifteen (15) years. In another case, *Vega–Barvo,* 729 F.2d at 1349, the court wrote:

> Reasonable suspicion to justify a strip search can only be met by a showing of articulable facts which are particularized as to the place to be searched. [cites omitted]. The burden of proof for this showing is on the Government.
>
> \*     \*     \*     \*     \*     \*
>
> In most of these cases, the suspect was initially approached because he fit a drug courier profile. It is not the profile, however, but the factors which make up the profile which are crucial to whether or not there is a reasonable suspicion. If the profile is overly general, it carries little weight in this determination.

Earlier in the same opinion the court noted that the "personal indignity suffered by the individual searched controls the level of suspicion required to make the search reasonable," and that the "embarrassment caused by the exposure of intimate body

parts is often a determinative factor in the constitutionality of border searches."

■ Objective legal reasonableness, used in assessing an official action where qualified immunity is raised as a defense, *Anderson v. Creighton*, 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), citing *Harlow v. Fitzgerald*, 457 U.S. 800, 819, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), means sound justification based on observable phenomena which is uninfluenced by emotion, conjecture or prejudice. The standard will not permit reliance on a general and fluid profile of persons as a basis for inflicting the level of humiliation described in this case.[2]

■ *Vega–Barvo*, a criminal case, teaches in unequivocal language that a forced disrobing and exposure of the vaginal and rectal cavities for visual inspection by strangers is a gross indignity to a woman of ordinary sensibilities for which there must be the highest level of reasonable suspicion. The defendants cannot complain that there is still some uncertainty in the law. "Although officials need not predict the future course of constitutional law, they are required to relate established law to analogous factual settings." *Adams v. St. Lucie County Sheriff's Dept.*, 962 F.2d 1563, 1569 (11th Cir.1992), citing *Stewart v. Baldwin County Bd. of Educ.*, 908 F.2d 1499 (11th Cir.1990).

## Discussion

■ As phrased by Brent, the question is whether on an objective basis Customs inspectors had a reasonable suspicion that she was an alimentary canal smuggler at each of the three graduated steps of her July 20, 1991 detention: (1) during her initial detention; (2) during her strip search, vagina and rectum exam and the monitoring of her urine; (3) and during the x-ray and medical examination at the hospital.

The defendants rely on criminal cases that were decided the same time as *Vega–Barvo*. In *United States v. Saldarriaga–Marin*, 734 F.2d 1425 (11th Cir.1984) all three appellants arrived at Miami from Columbia, a source country. A passenger on the same flight admitted to customs agents that she had swallowed fifty pellets containing drugs. After her admission, which raised reasonable suspicion that others on board the plane could be drug smugglers, the three appellants were detained because of their unusual attire; their nervous behavior; the fact that their tickets had been purchased at the same time and place as the passenger already in custody; the fact that their itineraries also matched the passenger in custody and each other; and because they could not provide addresses, telephone numbers or any other information about their relatives or business. These facts raised reasonable suspicion that the three appellants were smuggling drugs. Appellants were taken to a secondary inspection area and advised of their rights. When further questioning failed to allay the customs agents' suspicions, the appellants were asked to submit to x-ray and a medical examination. The consensual non-invasive medical examination revealed that indeed drugs were being carried internally.

In *United States v. Pino*, an internal search of the suspect was found reasonable because he was a South American, he arrived at Miami alone from a source country, he wore inexpensive clothes, his ticket had been purchased for cash by another person, he appeared nervous and disori-

---

2. This case suggests strongly that courts should be cautious in deferring to subjective determinations by even trained inspectors. The defendant in this case, Customs Inspector Seymour Schor, persuaded a jury in another case with testimony that he suspected a traveler was transporting drugs because he was "fairly deadpan," expressionless, without visible signs of agitation and did not protest being singled out for questioning. *United States v. Rivera*, 926 F.2d 1564, 1568 (11th Cir.1991). By affidavit submitted in this case he concluded, erroneously, that Brent was a drug carrier because her reaction was exactly opposite that of the defendant in the *Rivera* case. If such testimony could constitute "articulable suspicion" an inspector could justify a search of anyone.

ented, and he could provide no details regarding the purpose of his business trip. It was not the general profile, but the responses to routine questions which raised suspicion that Pino was a drug smuggler. After being advised of his rights he consented to x-rays and a medical examination which revealed that he indeed was carrying drugs internally.

In this case, Customs inspectors based their suspicion that Brent was an internal drug carrier on the following facts and observations: (1) a general profile regarding Nigerian men on the same flight as African–American women; (2) Brent arrived from a known source country; (3) she showed disapproval at the treatment Elbute was receiving; (4) her ticket had been purchased by a friend with a credit card from the same agency where Elbute's was purchased (but obviously not on the same date); (5) she, like Elbute was going to Houston; (6) she wore inexpensive clothes; and (7) she became agitated when confronted.

This case is easily distinguishable from Saldarriaga–Marin and Pino based on the level of suspicion had by agents before an intrusion, and the level of indignity associated with the intrusion after the inspectors decided to search. Brent's co-passenger, whom she did not know, did not admit to carrying drugs nor were any found on him; Brent's answers, though described as vague, were not misleading or inconsistent; she presented verifiable residence and employment information—that she was heading home to Houston where she worked as a rehabilitation counselor; and her ticket, although purchased by a friend, was on a credit card. Rather than attempt to verify Brent's information, which might have dispelled the inspectors' suspicions, they intensified the search based on the profile and her protestations. Evidence commonly associated with internal drug carriers such as cream or ointment for lubrication; medication or substances to suppress bowel movements, inconsistent, incoherent or confused statements; and rigid or distended abdomen, were totally absent.

At the end of the first two levels of the three-tier investigation there was nothing rising to the level of articulable suspicion to justify moving to a higher level of intrusion. Brent's name was entered into the Treasury Enforcement Computer Systems which also was negative. No drugs or paraphernalia associated with drugs were found in the strip search, vaginal/rectum exam and urine monitoring to justify the manacling and transporting of Brent to a hospital prison ward for x-rays.

This case is almost on all fours factually with Adedeji v. United States, 782 F.Supp. 688 (D.Mass.1992), a civil case, except that here there is even less as particularized articulable suspicion. In Adedeji it was held that Customs inspectors did not have reasonable suspicion to justify ordering the plaintiff, a Nigerian national, to disrobe and bend over for an inspection of her rectal and vaginal cavities. The facts relied upon by inspectors were: (1) that she was evasive when asked how much currency she was carrying, (2) had one suitcase with very little clothing, (3) had made numerous trips to Nigeria, a source country, (4) had purchased a round trip ticket for cash in Nigeria on the day before, and (5) she was carrying skin lotion and hair protein jelly which were potential lubricants for use with internal smuggling. Other evidence known to the inspectors sufficiently dispelled the above factors as grounds for reasonable suspicion.

### Waiver

■ Schor and Ellis allege that Brent waived her Miranda rights and signed a consent for an x-ray. Brent counter argues that her consent was coerced. Whether Brent voluntarily consented to the hospital examination and x-ray is a genuine question of material fact and is not appropriate for a determination on summary judgment.

### Conclusion

Having considered the currently applicable law on intrusive border searches, finding that the law was clearly established at

the time the actions occurred, and having applied that law to the facts of this case considered in a light most favorable to the non-movant, the qualified immunity defense must fail. Objective reasonableness of the inspectors' conduct, as measured by reference to the clearly established law, dictates this result. The second level of search which included the intrusive strip, body cavity search and monitoring of urine was unwarranted. Nothing learned during the baggage inspection and interrogation, beyond the general profile, gave rise to a reasonable suspicion which can be objectively articulated. After the strip, body cavity searches and monitoring of urine failed to reveal any evidence of drugs, there was no reasonable suspicion to go to the third level which included the imprisonment and transfer of Brent to a hospital for x-ray and medical examination.

 Supervisory inspectors Schor and Ellis made the decisions to conduct the intrusive searches. The other inspectors exercised no discretionary authority. Grim, Pietri, Dellane, Ashley, Williams and Blair acted at the directions of Schor and Ellis. Grim inspected Elbute and had no other contact with Brent. Pietri, under orders of Schor and Ellis, asked Brent routine travel questions, obtained her documents and walked her to the secondary examination area. Dellane, on Schor and Ellis' orders, witnessed the pat-down and strip search, traveled with Brent to Jackson Memorial Hospital and returned her to the airport. Ashley on orders of Schor and Ellis, witnessed the pat-down and strip search. Williams on orders of Schor and Ellis took Brent to the x-ray room and arranged her return to the airport. Blair at the direction of Schor and Ellis conducted the pat-down and strip search. Neither Brent nor the inspectors have directed the Court to any place in the record for allegations or proof that Luis Sanchez participated in the actions giving rise to the cause of action.

Accordingly, it is

**ORDERED AND ADJUDGED** that the motion [D.E.66] is **GRANTED** in part and **DENIED** in part. As to Prospero Ellis and Seymor Schor the qualified immunity motion is **DENIED**. As to Francine Williams, Lee Sanchez–Blair, Odesta Ashley, Kathryn Dellane, Carl Pietri and Ricky R. Grim the qualified immunity motion is **GRANTED**. The parties have not directed the Court to any place in .the record for allegations or proof that Luis Sanchez participated in the actions giving rise· to any cause of action. Further, in that Luis Sanchez was never served, as to him the case is **DISMISSED**.