UNITED STATES of America

v.

**Maduwuba Oluchukwu IBEKWE.**

No. 90–266–CR–T–17.

United States District Court,
M.D. Florida,
Tampa Division.

April 1, 1991.

Mark Jay Krum, Asst. U.S. Atty., Tampa, Fla., for the U.S.

D. Frank Winkles, Winkles, Trombley & Kynes, P.A., Ricky Williams, Tampa, Fla., Herbert A. Igbanugo, Hassan & Reed, Ltd., Minneapolis, Minn., Anthony Martinez, Asst. Federal Public Defender, Tampa, Fla., for defendant.

## ORDER ON MOTIONS TO SUPPRESS

KOVACHEVICH, District Judge.

This cause is before the Court on Defendant Ibekwe's motions to suppress statements and physical evidence, allegedly obtained in violation of the Fourth, Fifth, Sixth and Fourteenth Amendments. The Court held a hearing on the motions February 7 and 8, 1991. On the Government's motion, the Court reopened the hearing on March 28, 1991, for the taking of additional testimony.

At the time of the hearing counsel for Donald Igwebuike made an appearance, the Court having previously found Defendant Igwebuike had no standing to join in the motions to suppress, counsel was not allowed to participate in either hearing. Defendant Igwebuike filed a proffer following the hearing to preserve his position for appellate purposes. This Court has not considered that proffer in consideration of the motions to suppress.

### FINDINGS OF FACT

The Court makes the following findings of fact, based on the testimony elicited at the suppression hearing:

1. Defendant Maduwuba O. Ibekwe (hereafter Ibekwe) left Lagos, Nigeria 12:05 a.m., Nigerian time, on or about October 11, 1990, on a KLM flight to Amsterdam, Netherlands. (TR–1, pg. 157).[1] The flight between Lagos and Amsterdam was approximately six (6) hours in length. This information is verified by Government's Exhibit 3.

2. Ibekwe testified that he ate one meal and a snack on that flight. (TR–1, pgs. 158, 161).

3. Defendant had a layover of six (6) to seven (7) hours in Amsterdam. He did not eat anything during the layover because he did not have much cash and did not want to bother with making a currency exchange. (TR–1, pg. 158).

4. From Amsterdam, Ibekwe boarded a KLM flight to Orlando, Florida, leaving at between 1:00 and 2:00 p.m. Amsterdam time. The flight lasted approximately eight (8) hours. (TR–1, pg. 159, Gov. Ex. 3).

5. Defendant testified that he ate two (2) meals during the flight. The first meal was some type of bread and meat sandwich, and he ate the entire meal. The second meal was beefsteak and he ate as much as he could, which was most of the meal. (TR–1, pg. 159). The Government disputes these claims. One of the agents stated that when he questioned the Defendant, Ibekwe said that he ate ham on the flight. However, when the agent checked the flight menu, he was told that steak and chicken were served. (TR–1, pg. 63). Also, according to medical testimony from Dr. Paula Mueller (hereinafter Dr. Mueller) it would be surprising if the Defendant could have tolerated a full meal, given how full his stomach was. (TR–3, pg. 31).

6. Defendant's flight was scheduled to land at Orlando International Airport (Orlando) at around 6:30 p.m., but arrived at 7:05 p.m. Ibekwe had a connecting flight to Tampa, Florida, scheduled to leave Orlando at 7:45 p.m. (TR–1, pg. 138, Gov. Ex 3).

7. Defendant passed through the Immigration area. He then stood in line in the baggage claim area of the Federal Inspection Station located in the international terminal. The line was single file and U.S. Customs Inspector Ronald Dorr (hereafter Dorr) was at the head of the line collecting customs declarations. There were ten to fifteen (10–15) people in line ahead of Ibekwe. (TR–1, pgs. 19, 21, 138). Defendant had his customs declaration and airplane tickets inside his passport. (TR–1, pg. 140).

8. Inspector Dorr was dressed in the uniform of the Customs Service, which included arm patches and a badge. (TR–1, pgs. 21–22).

9. Defendant asserts that Dorr did not examine the customs declarations nor ask questions of any person in line before him, all of whom were white, as he was the only black on the flight. When he reached the

---

1. The transcript of February 7, 1991, will be referred to as TR–1, the transcript of February 8, 1991, will be referred to as TR–2, and the transcript of March 28, 1991, will be referred to as TR–3.

front of the line, Inspector Dorr took his passport and immediately called for another employee to take over and process the remainder of the line. (TR–1, pg. 140).

10. The inspector testified that he approached the defendant because he noticed several things: 1) he was a lone male carrying a briefcase; most people arriving in Orlando are family groups/ tourists; 2) he was apparently of West African descent; his passport was green which Dorr recognized as Nigeria and Dorr was aware that Nigeria is a source country, he personally had interdicted drugs from a Nigerian national in November 1989; and 3) Ibekwe was a little nervous and seemed a "little preoccupied." This behavior included a refusal to maintain eye contact. (TR–1, pgs. 22, 23, 25, 42, 50).

11. The Customs Service does not work on the basis of drug profiles. (TR–1, pg. 43). Dorr stated that there was nothing unusual in the amount of luggage Defendant was carrying; his eyes were not dilated; there appeared to be nothing unusual in his speech pattern or walk; and there were no needle marks observable on Defendant. (TR–1, pgs. 43, 54).

12. Dorr interviewed Ibekwe in the arrival area between forty-five and sixty (45–60) minutes according to Defendant and this estimate is not disputed. Inspector Dorr, during this time, stated the following as reasons for his suspicions of Ibekwe:

a. Ibekwe's passport indicated two (2) previous trips into the United States, March and August, 1990, and Dorr did not think the amount of money it cost for the three (3) trips (about $2,000.00 per trip) was consistent with Defendant's stated occupation of substitute school teacher. (TR–1, pg. 23, 26).

b. The customs declaration gave a Tampa address and Ibekwe stated he lived in Tampa. The airline ticket itinerary (Government Exhibit 3) reflected that it was purchased through a travel agent in Bloomington, Minnesota. Dorr stated he was aware that "it's common for smugglers to have tickets purchased by a third person." (TR–1, pg. 24). Defendant explained that his ticket was purchased by a friend, Donald Igwebuike, as a loan because he needed to go to Nigeria and had no money. (TR–2, pg. 29, TR–2, pg. 61).

c. Again, Dorr felt the Defendant was "uneasy" during the interview, couldn't maintain eye contact, and kept moving around. Dorr believed this behavior to be indicative of someone not telling the truth. (TR–1, pg. 25).

d. Ibekwe stated that he had a small business and that he had gone to Nigeria to sell computer parts and disks, but Dorr thought that he was unable to elaborate on what he sold and didn't "seem" to have vast knowledge of computers. (TR–1, pg. 26).

e. Defendant did state he had sold about $5,000.00 worth of computer parts in Nigeria, but he had no large sums of money. He explained that the money had been taken to a clearing house in Nigeria to forward through proper procedures, but could not produce a receipt from the clearing house. (TR–1, pgs. 26–27, 142).

f. The customs declaration stated he had food products. Dorr was aware that smugglers often used agricultural products to have themselves diverted to agriculture inspections and away from the Customs Service. (TR–1, pgs. 25, 50).

13. Inspector Dorr made the decision to inspect the luggage of Ibekwe. When the stored luggage was opened, no food products were found. (TR–1, pgs. 28, 140). Defendant stated that he purchased food products in Nigeria; i.e., melon, red pepper. Since they were perishable he left them in the refrigerator at the hotel to pack at the last minute and forgot to pack them when he left. He was upset when the luggage was opened and he discovered the items had been left behind. (TR–1, pgs. 28, 139–40, 162).

14. The luggage did contain receipts which Ibekwe maintains were for food products purchased in Nigeria. This evidence was not disputed by the Government witnesses. Dorr testified that there were receipts in the luggage, but he did not know whether they were for the purchase of food. (TR–1, pgs. 44–45).

15. The luggage did not contain any gloves, condoms, or laxatives, but did contain a "lotion" of the kind Dorr had seen used as a lubricant for body insertions. (TR–1, pg. 46). At the conclusion of the interview and luggage search, Dorr did not feel he had sufficient grounds to conduct a strip search of the defendant. (TR–1, pg. 60).

16. Dorr sought permission from his supervisor, Becky Skipper, Supervisory Customs Inspector, (hereafter Skipper) to conduct a pat down search on the Defendant. Dorr told Skipper that some of the answers to questions posed to the Defendant were not clear or were contradictory. She gave permission for the pat down. (TR–1, pgs. 29, 87, TR–2, pgs. 98, 102–103).

17. Dorr and Inspector Edward J. Coyne (hereafter Coyne) took the Defendant into a private room. Dorr conducted the pat down while Coyne observed.[2] Dorr felt a hard object in the Defendant's groin area, to the rear of the testicles, and asked him to drop his pants and lower his undergarments. (TR–1, pgs. 30, 55–56, 145, TR–2, pg. 84).

18. Dorr found a paper towel in the Defendant's underwear that contained three (3) pellets wrapped in electrical tape and covered with traces of feces. When penetrated, the pellets contained a white, powdery substance. (TR–1, pgs. 31, 148).

19. After the search, Ibekwe was handcuffed and taken to the general office area. The agents tested the powder in the pellets and Dorr testified that the pellets tested positive for heroin. (TR–1, pgs. 31, 148).

20. Subsequently, Dorr read the Defendant the following statement from a piece of paper (Government's Ex. 1):

Before we ask you any questions. It is my duty to advise you of your rights. You have the right to remain silent. Anything you say can be used against you in court, or other proceedings. You have the right to consult an attorney *before making any statement or answering any question, and you may have him present with you during questioning.*

You may have an attorney appointed by the U.S. Magistrate or the Court to represent you if you cannot afford or otherwise obtain one.

If you decide to answer questions now, with or without a lawyer, you still have the right to stop the questioning at any time, or to stop the questioning for the purpose of consulting a lawyer.

HOWEVER

You may waive the right to advice of counsel and your right to remain silent and answer questions or make a statement without consulting a lawyer if you so desire.

Do you understand your rights?

Do you waive your rights? (emphasis supplied)

Defendant stated he understood his rights and refused to sign the waiver form which appeared at the bottom of the form from which Dorr read. (TR–1, pgs. 31, 33–34, 148–149, 166–67).

21. Defendant contends that this is the point at which he first requested that he be allowed to call an attorney, a friend he intended to consult. (TR–1, pgs. 149, 167). He also alleges that he told the "lady supervisor" (Inspector Skipper) that he wanted an attorney. (TR–1, pg. 150). Inspector Dorr disputes this contention, but does admit that Ibekwe did ask for counsel before he was taken from the airport, after being interviewed by the duty agent. (TR–1, pgs. 34, 37, 62, 86–87). Inspector Skipper denies that Defendant every spoke to her and asked to be allowed to call an attorney. (TR–2, 99).

22. Dorr called a duty agent. It took about forty-five (45) minutes for Special Agent David Moore (hereafter Moore) to arrive and Dorr stated that during that time Defendant was not asked any questions. He advised Ibekwe that he was under arrest, that he would be taken into custody, and that he needed to advise the agents if he had ingested anything so they could get medical treatment. (TR–1, pgs. 35, 66).

---

**2.** The Court finds the testimony of Inspectors   Dorr and Coyne more credible on this issue.

23. When Moore arrived he again advised the Defendant of his rights, reiterating the rights read by Dorr. (Government Ex. 2). Again, Defendant stated he understood his rights. At this point, the testimony again diverges. Defendant testified that he told Moore that he wanted to talk to an attorney, whereas Dorr and Moore stated that he agreed to answer questions and did not ask for an attorney. (TR–1, pgs. 35–36, 67–69, 149–150). Agent Moore, however, later stated that he honestly could not recall whether or not Defendant had asked for an attorney when they first made contact. (TR–1, pg. 77).

24. Moore then interviewed the Defendant, for approximately twenty (20) minutes, and took a statement from him, during which he stated that the Defendant made the following admissions:

a. He had nothing besides the three (3) pellets in or on him.

b. He brought the pellets from a foreign country to the United States.

c. The pellets were given to him by someone in Nigeria with the possibility of doing more business.

d. He didn't know whether the substance in the pellets was cocaine or heroin, but he thought the value was between $4,000 and $5,000.

(TR–1, pgs. 70–71). Moore testified that he terminated the interview out of concern for the Defendant's medical safety and that he personally did not interview Ibekwe at any other time. (TR–1, pgs. 72–73).

25. At about 11:00 p.m., the agents decided to transport the Defendant to Orlando Regional Hospital (hereafter the Hospital) in order to *monitor his bowel movements,* since they believed him to be an internal smuggler based on the feces on the other contraband. (TR–1, pgs. 36, 57).

26. There is no dispute that at this juncture Ibekwe did request an attorney; this fact is confirmed by Coyne, Moore, and Dorr. (TR–1, pgs. 37, 57, 77, 149). It is also undisputed that Dorr refused to allow Defendant to contact counsel, saying that he was in a secondary customs inspection and was not entitled to talk to an attorney. (TR–1, pgs. 37, 77). In fact, Agent Moore stated that if Dorr told the Defendant that allowing him to talk to an attorney would interfere with the investigation, it would not have been far from the truth. (TR–1, pg. 78).

27. Defendant maintains that he requested an attorney immediately upon being read his rights and that he continued to make the request intermittently, including immediately prior to being taken to the hospital. He also testified that whenever he asked anyone besides Dorr about contacting an attorney, he was told that it was Dorr's decision because it was his investigation. (TR–1, pgs. 149–50). Further, when he asked Dorr, he was told that the rights that were read meant that "until I was charged and in Court that was when I will have the right to talk to a lawyer, but as far as now is concerned, I'm not entitled to a lawyer and he's not going to let me do that" and that Defendant might as well get used to that. (TR–1, pgs. 149, 150).

28. While he was still at the airport, the agents requested that the Defendant sign a release to be x-rayed. The Defendant refused to sign the release, unless he was given an attorney. (TR–1, pgs. 88, 150).

29. Ibekwe was admitted to the emergency room of the Hospital at approximately 11:45 p.m. on October 11, 1991, between four (4) and five (5) hours after he was first detained by Dorr. He was admitted over his express objections and was handcuffed to his bed for some period of time. (TR–1, pgs. 39, 56, 171). After arriving at the Hospital, while still in the emergency room, Defendant again expressed his desire to consult with counsel without success. (TR–1, pgs. 78–79). The agents assert that there was no further questioning conducted after they left the airport. (TR–1, pgs. 37, 40, 80).

30. At the re-hearing on this motion to suppress, the Government provided the Court with medical testimony. On October 12, 1990 at 12:30 a.m., Dr. Paula D. Mueller saw the Defendant in the emergency room of the Orlando Regional Medical Center. Dr. Mueller testified that Ibekwe refused to give any information to her or to be examined. The patient also refused to sign a hospital consent form. The doctor did

testify that the Defendant asked to speak to an attorney in her presence *and* in the presence of customs agents. (TR–3, pgs. 12, 55).

31. Since the Defendant seemed competent to refuse medical care, the doctor was unsure as to whether she could treat him. Thus, she called her "risk management person" because if a patient appears of sound mind, a doctor cannot force the patient to do anything against his will. (TR–3, pgs. 11–13, 43).

32. Dr. Mueller told the Court that her risk management person contacted the Orlando Police Department. The police department allegedly stated that the doctor could do what the customs officials directed her to do since the patient was under federal arrest. At the same time, the customs officials contacted their chief counsel in Miami and that person instructed them to go ahead with procedures the doctor believed to be medically necessary. (TR–3, pgs. 12–13). It should be noted that *all* of the above testimony is hearsay.

33. Customs agents informed Dr. Mueller that she would be acting within legal limits if she completed an examination of the Defendant and instructed her to medically evaluate Ibekwe. (TR–3, pgs. 13, 40). The doctor testified that if the customs agents had told her it was not legally permissible to proceed, she would not have because Ibekwe seemed fully competent to refuse medical treatment and he showed *no* life-threatening signs of drug intoxication. (TR–3, pg. 40). The doctor did state that if the Defendant had fought while refusing treatment she would not have released him from the hospital but instead, would have watched him for signs or symptoms of drug intoxication or bowel obstruction. (TR–3, pg. 46).

34. Since the customs officials suspected Ibekwe of "body packing", they asked Dr. Mueller to medically evaluate the Defendant. The doctor performed a physical examination to determine whether the Defendant showed any symptoms of heroin intoxication. Dr. Mueller reported that the Defendant's blood pressure and heart rate were "a bit elevated" but that he displayed no clinical evidence of heroin intoxication.

(TR–3, pg. 42, 60). She also completed a rectal exam. *Based on her examination, Dr. Mueller could not find any immediate life-threatening signs or symptoms of heroin intoxication.* (TR–3, pg. 14, 60).

35. As the physical examination of the Defendant did not reveal any evidence of internal drug smuggling, Doctor Mueller ordered several x-rays of Ibekwe. When asked if the Defendant consented to the x-rays, the doctor replied, "[w]hen the patient was told that he didn't really have a choice as to whether or not he could be—he was going to be examined, he was very cooperative throughout the whole exam." (TR–3, pg. 14). Based on the testimony, this Court finds as a matter of fact that the Defendant did *not* consent to the x-rays because he was told that he did not have a choice.

36. Dr. Mueller ordered several abdominal x-rays of the Defendant which revealed that he was body packing drugs. She stated that the Defendant was in a potentially life-threatening situation due to the existence of the drug-filled pellets in his system. The dangers to the Defendant were two-fold: (1) a drug-filled pellet could burst and the Defendant could die of drug intoxication; or (2) the pellets could create mechanical obstruction of the bowel, which could ultimately create major complications or even death. (TR–3, pgs. 18–19). If one of the pellets burst, the Defendant could stop breathing in five (5) minutes and subsequently die in four (4) to six (6) minutes. Should mechanical obstruction of the bowel occur and peritonitis set in, the Defendant could die in 24 to 48 hours. (TR–3, pgs. 62–63).

37. While in the emergency department of the hospital, but after the x-rays had been taken, a urine toxicology screen was obtained by the Defendant. The screen tested positive for opiates and amphetamines. Dr. Mueller testified that based on her physical examination of Ibekwe and the urine screen that the Defendant was *not* in a life-threatening emergency because he exhibited no signs of drug intoxication. (TR–3, pgs. 69–71).

38. The customs agents stated that they were told that hospitalization of Ibekwe was medically necessary and were given certain information by the medical staff, i.e., the x-rays showed foreign bodies, the Defendant had traces of heroin in his blood, that the doctors were concerned that if the pellets burst the situation might become life threatening. (TR–1, pgs. 39, 104–107, 120).

39. Ibekwe was transferred to the Cardiac Intensive Care Unit (hereafter ICU) sometime after he was transported to the Hospital. He was in bed with IVs in his hands and tubes in his nose. (TR–1, pg. 152). Defendant was subjected to multiple x-rays and blood tests after being hospitalized, without his consent. (TR–1, pgs. 56, 171, TR–2, pg. 9, 50). The medical bills show that on October 12, 1990, the day after the admission, Defendant had at least eight (8) abdominal x-rays, with six (6) being given on October 13 and two (2) on October 14, 1990. (Government's Ex. 5).

40. On the morning of October 12, 1990, at about 8:00 a.m., Inspector Dorr prepared to leave the Hospital when he testified that the Defendant asked if he could talk to Dorr. Dorr stated that he replied that he would not speak to the Defendant, but that he would notify the Office of Enforcement, which he did. (TR–1, pgs. 40–41). Defendant denies that he ever initiated any conversations with the Custom's agents or that he told Dorr he wanted to cooperate. (TR–2, 17, 44).

41. In response to Dorr's call, agents Jim Karb and Paul Hamrick (hereafter Karb and Hamrick) proceeded to the Hospital. (TR–1, pgs. 91, 103). Defendant once again had his rights read to him by Agent Karb and responded he understood the rights (Government's Ex. 2). (TR–1, pgs. 92–95). Agent Karb further testified that Ibekwe indicated he wanted to cooperate and did not request an attorney. However, the Defendant did not make any statements to Karb and Karb was unaware that the Defendant had previously requested counsel. (TR–1, pgs. 95, 98).

42. Upon initial contact, Agent Hamrick told the Defendant he understood he had been advised of his constitutional rights and asked if he understood them. Ibekwe responded in the affirmative. Again, the agent testified that Ibekwe said he wished to cooperate. (TR–1, pg. 108). Hamrick took a detailed statement from Defendant. (TR–1, pgs. 108–112).

43. Hamrick testified that at some point in time the Defendant agreed to cooperate by having his home telephone calls forwarded to the Hospital in order to allow the agents to monitor the calls and attempt to make a controlled delivery of the heroin. (TR–1, pgs. 112–113). The calls were made and received on Saturday, October 13, 1990. (TR–1, pg. 115).

44. Defendant's testimony is that he never voluntarily agreed to cooperate. Ibekwe states that the circumstances: he was in intensive care against his will; the Hospital staff was performing various medical procedures and testing against his will; he was unable to contact family, friends or attorney; and he was being badgered and harassed by the agents, were the only reasons he ever agreed to cooperate with the government. (TR–1, pg. 152, TR–2, pgs. 17–19, 53). Ibekwe consistently testified that he continuously asked for consultation with legal counsel to no avail and that, in fact, he was told that the only way he would be allowed to make any phone calls, including to counsel, was to cooperate. (TR–1, pg. 155, TR–2, pgs. 17–18).

45. Defendant also stated that the agents promised to take his home telephone off call forwarding. This was attempted on Sunday morning, but took some time which upset the Defendant. At that time, the Defendant entreated the two (2) agents to give him "their word" and he would cooperate, that he was doing what they asked, and he was "like a robot programmed to say what he was supposed to say." (Defendant's Ex. 3).

46. The agents discontinued the questioning on Sunday afternoon, after the problem over the telephone. Hamrick read Ibekwe his rights. This was the first time Hamrick actually read his rights to the Defendant. Hamrick then left the Hospital. (TR–1, pgs. 120, 133–134). As of Mon-

day morning, October 15, 1990, the Defendant's stool chart showed four (4) consecutive clear stools. (Government's Ex. 4). Defendant was discharged on that date and taken before the United States Magistrate/Judge in Orlando, Florida. (Government's Ex. 6, TR–1, p. 119).

47. It should be noted that during the re-hearing on this motion to suppress, the Court heard testimony from Stephen Arnold (hereinafter Arnold) from the Customs Service. He testified that he was familiar with the city of Orlando and that release and transportation from the Orange County Jail, where federal prisoners are housed, to the Orlando Regional Medical Center took approximately forty (40) minutes. He added that it could take longer, depending on the traffic. (TR–3, pg. 74).

## DISCUSSION

The first issue this Court will address is whether the stop of the Defendant in the Orlando airport was reasonable. We find that it was.

It is well established that warrantless searches at international borders of the United States may be performed even without a suspicion of criminal activity. *United States v. Ramsey*, 431 U.S. 606, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977); *United States v. Haley*, 743 F.2d 862, 864 (11th Cir.1984); *United States v. Hernandez–Cuartas*, 717 F.2d 552, 555 (11th Cir.1983).

■ A border search can be conducted at any location which constitutes the functional equivalent of a border. *United States v. Garcia*, 672 F.2d 1349, 1363 (11th Cir.1982). This circuit recognizes the fact that an airport can be the functional equivalent of a border when a flight originates outside the United States. *United States v. Santiago*, 837 F.2d 1545, 1548 (11th Cir. 1988). Since the Defendant, Ibekwe, flew into the United States from Amsterdam on a flight originating in Lagos, Nigeria, the Orlando airport was a border and the initial search of the Defendant was reasonable.

Next, the Court will address the question of whether the strip search of the Defendant at the airport was within legal boundaries. We find that it was.

Customs inspectors have almost unlimited authority to both search and detain persons entering the United States from foreign lands. 19 U.S.C. § 1582. However, the reasonableness requirement of the Fourth Amendment tempers this authority. *United States v. Villamonte–Marquez*, 462 U.S. 579, 103 S.Ct. 2573, 77 L.Ed.2d 22 (1983). While the Supreme Court has not defined what a "reasonable" search would be when a body search was performed, it has stated that the search may be unreasonable if it were done in a "particularly offensive manner." *Ramsey*, 431 U.S. at 618, n. 13, 97 S.Ct. at 1979.

■ This circuit established that a pat-down, or frisk, is not an unreasonably intrusive search and therefore can be done with no more than a generalized "mere suspicion." *United States v. Vega–Barvo*, 729 F.2d 1341, 1345 (11th Cir.1984), *cert. denied*, 469 U.S. 1088, 105 S.Ct. 597, 83 L.Ed.2d 706 (1984) (citing *United States v. Sandler*, 644 F.2d 1163, 1167, 1169 (5th Cir.1981) (en banc)). Further, a person's decision to cross a United States border provides sufficient justification for a pat-down search. *Vega–Barvo*, 729 F.2d at 1345.

■ Once a reasonable suspicion exists, a strip search is constitutionally permissible. *Id.* We find that a pat-down search was carried out on the Defendant. In performing the pat-down, the customs inspector felt a hard, foreign object in the Defendant's groin area. Since the agent felt something unusual on the Defendant's person, a reasonable suspicion was created which enabled the customs inspector to conduct a strip search of the Defendant. As a result of the legal strip search, the inspector found three pellets containing what he suspected to be illegal drugs in the Defendant's underwear.

■ The third issue before this Court is whether the Defendant's statements may be suppressed due to the fact that he asked for an attorney during the customs interrogation. We find that Defendant did ask for an attorney at the airport and that he was not allowed to contact an attorney until Monday, October 15, 1990. For these

reasons, the Defendant's statements must be suppressed.

The Government contends that Dorr advised the Defendant of his right to remain silent and also his right to have an attorney present during questioning following the strip search at the airport. *See Miranda v. Arizona,* 384 U.S. 436, 467–479, 86 S.Ct. 1602, 1624–1630, 16 L.Ed.2d 694 (1966). The Government further contends that Ibekwe did not invoke his Fifth Amendment right to counsel at that time and made statements to the customs inspectors. The Defendant, on the other hand, alleges that he immediately asked for an attorney after being advised of his rights.

Based upon the testimony presented to this Court, we find as a matter of fact, that the Defendant requested an attorney directly following the reading of his *Miranda* rights. It has long been held that once a defendant requests counsel, all interrogation must cease. *Id.* at 474, 86 S.Ct. at 1628. Thus, all of Ibekwe's statements made at the airport must be suppressed. We also find, and the government does not otherwise allege, that the Defendant did not waive his Fifth Amendment privilege while at the airport. It is undisputed that the Defendant asked for an attorney just prior to leaving the airport. Further, Dr. Mueller testified that while at the hospital, the Defendant requested to speak to an attorney in her presence and in the presence of customs agents.

■ Once a defendant has invoked his right to have counsel present during custodial interrogation, the Government must show that the defendant waived his right to counsel before his statements will be deemed admissible. *Id.* at 475, 86 S.Ct. at 1628. However, the burden the Government has in doing so is weighty: "The courts must presume that a defendant did not waive his rights; the prosecution's burden is great ..." *North Carolina v. Butler,* 441 U.S. 369, 373, 99 S.Ct. 1755, 1757, 60 L.Ed.2d 286 (1979).

Hence, this Court must conduct two discreet inquiries to determine whether the Defendant's right to counsel was effectively surrendered: (1) the prosecution must show that the defendant's waiver of his constitutional right was voluntary; and (2) that he "knowingly and intelligently relinquished his right to counsel." *Edwards v. Arizona,* 451 U.S. 477, 483–84, 101 S.Ct. 1880, 1884, 68 L.Ed.2d 378 (1981).

The determination of a knowing and voluntary waiver turns upon the events and circumstances of each particular case. *Id.,* at 482, 101 S.Ct. at 1883 (citing *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938)). Additionally, the waiver will only be valid if the accused himself initiates the discussion with the authorities. *Id.,* 451 U.S. at 485, 101 S.Ct. at 1885.

■ In the instant case, the Government asserts that the Defendant himself initiated an exchange with Inspector Dorr at the hospital on the morning of October 12, 1990. Dorr testified, "the Defendant asked if I was leaving and I told him I was, and he asked in a low voice if he could talk to me. *In my assumption he wanted to talk about the case.*" (Record at 40) (emphasis added).

In *Oregon v. Bradshaw,* 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983), the Supreme Court held that the question, "Well, what is going to happen to me now?" was a valid waiver because, in light of the *Edwards* rule, it evinced a desire to discuss the defendant's investigation. However, the circumstances surrounding the present case and *Bradshaw* render a comparison between them meaningless. When the defendant in *Bradshaw* stated the above question, he was in the process of being transported from a police station to the county jail. Also, the officer in the car with the *Bradshaw* defendant stressed to him that his statement needed to be given of his own free will because he had asked for an attorney. *Id.* at 1042, 103 S.Ct. at 2833.

In this case, Ibekwe had been forced to submit to a physical and rectal examination, given x-rays and multiple blood tests, had IVs inserted in his hands and a tube inserted up his nose through which two (2) liters of "Go Lightly" flowed per hour, and at one point was handcuffed to his hospital

bed. At no time did the Defendant agree to any medical procedures and a court order for medical attention was never obtained by the customs officials. In fact, the Defendant testified that immediately after his admission to the hospital he was examined by a toxicologist who took his temperature, blood pressure and pulse and examined his eyes for pupil dilation. According to both the doctor's and the Defendant's testimonies, there were no external signs of Ibekwe's being a carrier of illegal drugs.

Since the testimony from the Government's witness, Dr. Mueller, supports Ibekwe's testimony that external signs of his being an internal drug smuggler were not evident, this Court finds such to be true. The court noted in *Bradshaw*, that *Edwards* details a prophylactic rule "designed to protect an accused in police custody from being badgered by the police officers ..." *Id.*, 462 U.S. at 1044, 103 S.Ct. at 2834. The court further elaborated on this statement in *Smith v. Illinois*, 469 U.S. 91, 98, 105 S.Ct. 490, 494, 83 L.Ed.2d 488 (1984), when it held that badgering—"explicit or subtle, deliberate or unintentional—might otherwise wear down the accused and persuade him to incriminate himself notwithstanding his earlier request for counsel's assistance." (citing *Bradshaw*, 462 U.S. at 1044, 103 S.Ct. at 2834).

We believe that the circumstances surrounding Ibekwe's detention amounted to badgering by the customs agents. After several x-rays and procedures had been performed, the Defendant asked to speak with Inspector Dorr. He did not indicate that he wished to speak about his case. After Dorr left and notified the Office of Enforcement of the Defendant's wish to talk, Agents Karb and Hamrick arrived on the scene.

The Defendant was again read his *Miranda* rights by Agent Karb, but did not make any statements at that time. In fact, Agent Karb was even unaware that Ibekwe had asked for an attorney prior to his arrival. However, the Supreme Court has held that the Sixth Amendment requires that knowledge of asking for an attorney possessed by one government agent will be imputed to another. *Michi-*gan v. Jackson, 475 U.S. 625, 634, 106 S.Ct. 1404, 1410, 89 L.Ed.2d 631 (1986). Thus, knowledge of Ibekwe's request for counsel should be imputed to all customs agents involved in the case. It is unknown whether Agent Hamrick had actual knowledge of Ibekwe's request for counsel.

After the Defendant was read his rights by Agent Karb, Agent Hamrick spoke with the Defendant. He did not read his rights to the Defendant again but merely asked him if he understood them. Ibekwe made statements to Hamrick at that time. Thus, the Defendant did not make any statements to the customs agents until sometime after 8:00 a.m. on October 12, 1990. These statements were made only after: the Defendant asked for an attorney but was not permitted to contact one; the Defendant was forced to submit to numerous x-rays, blood tests, insertions of IVs and tubes; and being handcuffed to his hospital bed. Based upon the circumstances surrounding the time in which Ibekwe made these statements, this Court finds that the Defendant did not knowingly and voluntarily waive his right to remain silent and his right to an attorney. The statements must be suppressed.

■ A discussion of the Defendant's treatment at the Hospital leads us to the fourth issue of this order: whether the heroin excreted by the Defendant while in the Hospital can be suppressed, since it was obtained after intrusive procedures without either the Defendant's consent or a court order. We find that the Defendant's constitutional rights were violated; however, the evidence is nonetheless admissible. This Court finds the enlarged interpretation by the United States Customs Service of judicial precedent detailed herein alarming.

While the Court recognizes that the Fourth Amendment's protection is different at a national border, the Defendant presented himself at the border and subjected himself to the law enforcement powers of the Government, thereby entitling him to be free from unreasonable searches and seizures. In *United States v. Monto-*ya De Hernandez, 473 U.S. 531, 105 S.Ct.

3304, 87 L.Ed.2d 381 (1985), the Court held that the detention of a person at a border that extended beyond the scope of a normal customs search is justified if, based on the circumstances, the agents reasonably suspect that the person is "smuggling contraband in [his] alimentary canal." *Id.* at 541, 105 S.Ct. at 3310.

In that case, the customs inspectors held the accused incommunicado for 16 hours prior to seeking a warrant. They suspected that she was an internal carrier of illegal drugs and offered her the choice of awaiting a bowel movement or an x-ray. The defendant refused the x-ray. Hence the customs officials were faced with only two choices: keep the defendant in custody until their suspicions could be confirmed or denied, or, "turn her loose." *Id.* at 543, 105 S.Ct. at 3311. The inspectors exercised the first option and detained the defendant. The Court held that the detention was not unreasonably long. *Id.* at 544, 105 S.Ct. at 3312.

In the instant case, Ibekwe was not offered any choices. He was forced to submit to a physical examination. When that exam did not provide any evidence that the Defendant was a drug smuggler, he was forced to submit to x-rays and subsequent medical procedures. As the Court has held: "When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or government enforcement agent." *Johnson v. United States,* 333 U.S. 10, 13–14, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948).

There were no exigent circumstances in this case based on the testimony heard by this Court that would render procuring a court order to physically examine and x-ray the Defendant improper or unduly burdensome. In fact, when the Government moved to re-hear this motion its primary witness, Dr. Mueller, confirmed this point. The doctor reiterated several times that the Defendant displayed *no* signs of heroin intoxication. Thus, there was no reason why a court order could not have been obtained prior to physically examining and x-raying Ibekwe. As Justice Brennan stated in his dissent in *Montoya,* (citing *Schmerber v. California,* 384 U.S. 757, 770, 86 S.Ct.

1826, 1835, 16 L.Ed.2d 908 (1966)), "[t]he importance of informed, detached and deliberate [judicial] determinations of the issue whether or not to invade another's body in search of evidence of guilt is indisputable and great."

In its memorandum, the Government contends that Eleventh Circuit precedent supports customs' forcing the Defendant to submit to a physical and rectal examination and x-rays. In particular, the Government cites, *United States v. Pino,* 729 F.2d 1357 (1984) and *United States v. Saldarriaga–Marin,* 734 F.2d 1425 (1984).

In *Pino,* the court stated that a greater amount of suspicion is necessary to justify a rectal exam than is required to justify a strip or x-ray search. *Pino,* 729 F.2d at 1359. The court further stated that the method in which the search is conducted is significant in determining its reasonableness. *Id.* at 1360. However, in *Pino,* the defendant consented to a physical and rectal examination and x-rays. The court noted that defendants suspected of internal smuggling face a "Hobson's choice." They may either consent to a particular search or wait until nature proves or disproves their innocence. Thus, the court noted, that consent is not the only determining factor of reasonableness. *Id.*

In the instant case, the Defendant did *not* consent to any type of medical or rectal search. He was not physically forced to submit to these exams, but was told he had no choice in the matter whatsoever. The Government did not wait for nature to take its course, but instead, in its impatience, forced the Defendant to submit to invasive procedures against his will and without court authorization. This factor, taken together with the fact that the Defendant had asked for an attorney, not once, not even twice, but several times and he was told by the customs agents that he could not have one adds up to a violation of Ibekwe's constitutional rights. In *Pino,* there were no Fifth Amendment implications. Likewise, in *Marin,* the defendants consented to x-ray examinations and none invoked his right to an attorney.

This Court does not dispute the fact that the customs officials needed to take the Defendant to the hospital. The possibility of civil liability, should something have happened to the Defendant, could easily have become a reality. In fact, Dr. Mueller testified that if the Defendant had fought to impede medical attention the appropriate course of action would have been to monitor him at the hospital. If Ibekwe had shown any signs of heroin intoxication or mechanical obstruction, medical care would have been readily available. Had the customs agents acted as those in *Montoya* did, they could have merely waited for nature to take its course and the Defendant would have excreted the pellets naturally. If a complication arose, the Defendant would be at the hospital and immediate medical attention could have been given. Thus, the Defendant's constitutional rights would not have been violated.

Therefore, we find that the Government lacked the requisite justification to force Ibekwe to submit to a physical and rectal examination and x-rays since he did not consent and no court order was obtained. However, the case of *Nix v. Williams*, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984), saves this evidence for the Government.

In *Nix*, the Court found that evidence that was illegally obtained is admissible if the prosecutors can establish by a preponderence of the evidence that the information would inevitably be obtained by lawful means. *Id.* at 466–467, 104 S.Ct. at 2521–2522. Since Ibekwe would have excreted the pellets naturally, or a life-threatening emergency would have arisen necessitating medical intervention, the heroin would inevitably have been obtained by the Government by lawful means.

This rationale causes the Court some consternation. In this case, the Defendant was forced to submit to a physical, and in particular, rectal examination and then subsequent x-rays, tube and IV insertions, etc. What will the customs service be "entitled" to do next to a defendant suspected of internal drug smuggling? This Court hopes it does not have to find out in another case. Accordingly, it is

ORDERED that the motions to suppress be granted in part and denied in part, as previously explicated.

DONE and ORDERED.