KRAVITCH, Senior Circuit Judge, dissenting, in which HATCHETT, Chief Judge, and BARKETT, Circuit Judge, join:

I fully agree that government officials acting within their discretionary authority should be shielded from liability for violating rights of which a reasonable person would not have known. The majority and I differ only as to whether the schoolhouse Fourth Amendment standard announced by the Supreme Court in New Jersey v. T.L.O., 469 U.S. 325 (1985), would lead a reasonable person to understand that the conduct in this case was prohibited. The majority finds qualified immunity by characterizing the Supreme Court's test as too general to guide any teacher, unless subsequent controlling precedent has applied it to virtually identical facts. In my view, stating that a constitutional test is general or that factually similar precedent is lacking bypasses the fundamental inquiry set out by the Supreme Court: determining whether the governing constitutional standard provides sufficient guidance, given the facts of the case, "that a reasonable official would understand that what he is doing violates [a constitutional] right." Anderson v. Creighton, 483 U.S. 635, 640 (1987). Because I believe that T.L.O. sufficiently forewarns teachers that strip searching eight-year-olds in pursuit of a few dollars violates the Fourth Amendment, I respectfully dissent.

Qualified immunity balances the competing concerns present in civil rights suits. Immunity serves the public "'need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous

1

exercise of official authority.'"  Harlow v. Fitzgerald, 457 U.S. 800, 807 (1982) (quoting Butz v. Economou, 438 U.S. 478, 506 (1978)).  Taken too far, however, immunity can undermine the purpose of section 1983 altogether, giving officials license to violate the most basic and longstanding constitutional rights. Qualified immunity accommodates these interests by protecting those who act in reasonable reliance upon established legal principles but permitting liability for clearly unconstitutional conduct.  Thus, immunity attaches only when official "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow, 457 U.S. at 818.

Interpreting the term "clearly established," the Supreme Court has warned courts not to base liability upon expansive legal truisms or to ignore material factual differences between present cases and precedent establishing the asserted constitutional right.  In Anderson, the Court emphasized that a right is not clearly established unless "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right."  483 U.S. at 640.[1]  We since have stated that "[g]eneral propositions have little to do with . . . qualified immunity."  Muhammad v.

_____

[1]We have explained that "the law must have earlier been developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that 'what he is doing' violates federal law." Lassiter v. Alabama A&M Univ., Bd. of Trustees, 28 F.3d 1146, 1149 (11th Cir. 1994) (en banc).

Wainwright, 839 F.2d 1422, 1424 (11th Cir. 1987).  Thus,
qualified immunity applies where the plaintiff can identify only
unworkable abstractions from prior case law and cannot show how
those principles would be applied later to different facts.[2]
Neither the Supreme Court nor this court, however, require
factual identity between prior and subsequent cases, for that
would create absolute immunity.[3]

I review these principles because the majority has taken a
rigid approach to their application in the present case.  Our
various formulations of the "clearly established" test -- that
prior cases must be factually similar to the case at bar, that
general abstractions are unhelpful -- represent a shorthand way
of saying that the clarity of a constitutional right (and,
therefore, official liability) depends upon the interplay of the
legal standard and the factual context to which the plaintiff

---

[2]For example, if the present case had arisen prior to
T.L.O., a teacher would have had no reasonable way of knowing
when she could search a given student, because the Fourth
Amendment had been haphazardly applied to schools.  Some courts
had held that it permitted searches only upon probable cause, see
State v. Mora, 330 So.2d 900 (La.), cert. denied, 429 U.S. 1004
(1976); others had held that school children enjoyed no Fourth
Amendment protection, as school officials acted in loco parentis.
See In re Donaldson, 75 Cal. Rptr. 220 (Dist. Ct. App. 1969).

[3]See Anderson, 483 U.S. at 640 ("This is not to say that an
official action is protected by qualified immunity unless the
very action in question has previously been held unlawful, but it
is to say that in the light of pre-existing law the unlawfulness
must be apparent.") (citations omitted); Adams v. St. Lucie
County Sheriff's Dept., 962 F.2d 1563, 1575 (11th Cir. 1992)
(Edmondson, J., dissenting), approved en banc, 998 F.2d 923 (11th
Cir. 1993) ("The facts [of prior precedent] need not be the same
as the facts of the immediate case.  But they do need to be
materially similar.").

3

alleges it applies. But it is not enough simply to label pre-existing law "general," or to identify factual distinctions in relevant precedent. Instead, a court must determine whether the generality of a rule casts doubt on its application to the present case or whether factual distinctions from prior precedent are "material," that is, they make the legal rule inapplicable in the later case or suggest that the present conduct is permissible.[4] By contrast, the majority today, declaring T.L.O. both general and factually distinguishable, abandons further analysis. This, I believe, is error.

As the Supreme Court recently reaffirmed, the search for specific rules in factually concrete cases should not overshadow the purpose of such a search -- determining whether the government actor had fair warning that his/her conduct was unconstitutional. In United States v. Lanier, 117 S. Ct. 1219 (1997), the Court unanimously held that: (1) civil rights liability requires only "fair warning" of constitutional rights, 117 S. Ct. at 1224-27; and (2) neither prior Supreme Court precedent nor factually similar precedent is necessary to provide such warning. The Court confirmed that decisional law generally, not only from the Supreme Court, can establish a right. Id. at

---

[4]For example, in Hartsfield v. Lemacks, 50 F.3d 950 (11th Cir. 1995), we rejected a qualified immunity defense in the face of a broad constitutional test. On the facts of that case, we held the police clearly failed to make "reasonable efforts" to avoid erroneous execution of a search warrant, thereby violating the Fourth Amendment.

1226-27.[5]  More importantly for present purposes, the Court stressed that rights founded on general statements of law may be enforced against government actors.  It observed that "notable factual distinctions" between prior cases and later ones did not require automatic immunity:

> [G]eneral statements of the law are not inherently incapable of giving fair and clear warning, and . . . a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though "the very action in question has [not] previously been held unlawful". . . .

Id. at 1227 (quoting Anderson, 483 U.S. at 640).  The purpose of factual specificity is to warn government officials when a constitutional test does not, by its own terms, apply to present actions.  Thus, it is necessary only when "an earlier case expressly leaves open whether a general rule applies to the

---

[5]I note the tension between the Court's reasoning and the majority's suggestion, ante at 13 n.2, that only the Supreme Court, Eleventh Circuit, or the highest court of the state can "clearly establish" the law.  Compare Courson v. McMillan, 939 F.2d 1479, 1497-98 (11th Cir. 1991) (only in-circuit precedent relevant) and Hansen v. Soldenwagner, 19 F.3d 573, 578 n.6 (11th Cir. 1994) (same) with Lanier, 117 S. Ct. at 1226-27 ("Although the Sixth Circuit was concerned . . . that disparate decisions in various Circuits might leave the law insufficiently certain even on a point widely considered, such a circumstance may be taken into account in deciding whether the warning is fair enough, without any need for a categorical rule that decisions of the Courts of Appeals and other courts are inadequate as a matter of law to provide it."); Elder v. Holloway, 114 S. Ct. 1019, 1023 (1994) ("A court engaging in review of a qualified immunity judgment should . . . use its full knowledge of its own and other relevant precedents.") (internal alterations and quotations omitted) and Greason v. Kemp, 891 F.2d 829, 833 (11th Cir. 1990) ("we look to the law established by the Supreme Court, the courts of appeals, and the district courts.").

particular type of conduct at issue. . . ." Id.[6]

Lanier is consistent both with prior Supreme Court precedent and the policy underlying qualified immunity. The Court has always required only that the "unlawfulness must be apparent," Anderson, 483 U.S. at 640, so actors "reasonably can anticipate when their conduct may give rise to liability. . . ." Davis v. Scherer, 468 U.S. 183, 195 (1984). Further, excepting all unconstitutional conduct governed by "general" constitutional standards would vitiate the balance struck by qualified immunity, as officials in clear violation of broad rules would escape liability.

Thus, we cannot dismiss T.L.O. by attaching the appellation "general" to the test it announces or by pointing to the absence of prior factually similar cases. In T.L.O., the Supreme Court noted lower courts' conflicting views regarding the application of the Fourth Amendment to schools, 469 U.S. at 332 n.2, and squarely addressed the issues before us today: when a search by a school official is authorized, and how intrusive a search the

---

[6]The majority dismisses Lanier as irrelevant to the instant case. I cannot agree. Although it concedes that "general principles of law can provide clear warning," ante at 16 n.3 (emphasis omitted), the majority is unwilling to accept T.L.O.'s guidance in the absence of its application to "facts materially similar to those of this school search." Id. at 17. Likewise, it reasons that "school officials cannot be required to construe general legal formulations that have not once been applied to a specific set of facts by any binding judicial authority." Id. at 18-19. I believe this analysis ignores Lanier's intent and, indeed, the Court's intent throughout its qualified immunity jurisprudence. Lanier and its precursors make liable those who violate established constitutional norms, even ones with a short pedigree in the decisional law.

6

Fourth Amendment tolerates.  As the majority recounts, the Court adopted a test born of the Terry v. Ohio, 392 U.S. 1 (1968), "reasonableness" standard, but did not leave us with reasonableness alone.  It announced a two-pronged test: first, the search must be justified at its inception, that is, "there are reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school," 469 U.S. at 342; and second, the search must be permissible in scope, that is, "the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction."  Id.[7]

This standard obviously can establish the law for certain factual situations.  For example, if school rules disallow chewing gum on campus, would the Fourth Amendment permit a strip search by a male teacher of a young girl reasonably suspected of bubblegum possession?  Plainly not.  See, e.g., Cornfield v. Consolidated High Sch. Dist. No. 230, 991 F.2d 1316, 1320 (7th Cir. 1993) ("A nude search of a student by an administrator or teacher of the opposite sex would obviously violate [the T.L.O.] standard.  Moreover, a highly intrusive search in response to a minor infraction would similarly not comport with . . . T.L.O.").  Indeed, as the teachers' counsel conceded at oral argument,

_____

[7]Given the case's history and its comprehensive test, I disagree with the conclusion, ante at 22, "that T.L.O. did not attempt to establish clearly the contours of a Fourth Amendment right as applied to the wide variety of school settings different from those involved in T.L.O."

7

certain schoolhouse searches violate the Fourth Amendment as a matter of common sense.  Thus, the question before our court, and incompletely answered by the majority, is whether the T.L.O. standard suggests "with obvious clarity," Lanier, 117 S. Ct. at 1227, that a strip search of schoolchildren for seven dollars is unconstitutional.

T.L.O., although not crystalline, is -- simply on the facts of the case before us -- a bright line.  Herring and Sirmon lacked even arguable reasonable suspicion to strip search Jenkins and McKenzie.[8]  The teachers offer the following evidence as creating reasonable suspicion to search: (1) several students implicated the plaintiffs and they accused one another; (2) McKenzie earlier had gone to the restroom; (3) the money was not found in the backpack or the students' shoes and socks; and (4) historically, other children had been caught with money in their apparel.  All of these justifications are specious.  First,

---

[8]My discussion is confined to the strip searches.  I concede that the initial search of McKenzie's backpack was justified at its inception and reasonable in scope.  Ashley Estell's report that Jenkins put the money in McKenzie's backpack gave reasonable suspicion to suspect that searching the backpack would turn up evidence of the theft.  See C.B. By and Through Breeding v. Driscoll, 82 F.3d 383, 388 (11th Cir. 1996).  Moreover, the backpack search, performed by the teacher and confined to the place identified as containing the contraband, was not excessive.  Further, although the search of the students' shoes and socks may have been questionable, qualified immunity is appropriate, because T.L.O. does not clearly prohibit such a search.  See Wynn v. Board of Educ. of Vestavia Hills, 508 So.2d 1170 (Ala. 1987) (search of shoes and socks for $6 justified at inception where two students searched were only ones in room when theft occurred; concluding, without discussion, that search "was not excessively intrusive").

Herring and Sirmon knew only of Ashley Estell's accusation[9] and the mutual finger-pointing by Jenkins, McKenzie, and Jamerson. Estell's testimony proved untrustworthy when the backpack search revealed nothing, leaving only the students' completely contradictory allegations. This testimony might be at the outer bounds of reasonable suspicion for one search, but it is not so for two.[10] Second, McKenzie's trip to the bathroom, although relevant to suspicion, was not communicated to Herring or Sirmon prior to the strip search.[11] Third, appellees' suggestion that the lack of evidence in the backpack or the students' shoes and

---

[9]The majority's statement, ante at 3, that "[s]everal students subsequently implicated" the girls is misleading because it does not speak to Herring and Sirmon's knowledge. Fannin testified that two other students, Micquael Scales and Jennifer Simmons, accused Jenkins, but only after Fannin left Herring and Sirmon in the hall with the girls and Jamerson. Fannin did not relate this information until Sirmon returned to the classroom while Herring conducted the first strip search.

[10]Even though Jamerson had implicated himself as the thief (by stating that he hid the money behind a filing cabinet), the teachers conducted a second strip search of the two girls. This was wholly unreasonable, especially in view of the fact that Jenkins stated that she saw Jamerson open the victim's purse, the girls had never stolen anything before, and Jamerson had a history of theft.

[11]There is a conflict in the record on this point, so I presume in favor of the plaintiffs. Herring claimed that Fannin told her of McKenzie's trip and suggested to Herring that money might be hidden in McKenzie's clothes. Herring then allegedly replied that she would take the girls to the bathroom and have them check their clothes. Fannin contradicts this account. Herring claimed the interchange occurred while the girls were putting their shoes and socks back on, but Fannin said she left the hall at that point. Fannin also had no knowledge that Herring might take the girls to the bathroom, but presumed they would go to the office, in accordance with policy. Further, Herring's testimony is unreliable because she changed her story, telling Principal Nelson that Jamerson, not Fannin, informed her that McKenzie went to the bathroom.

9

socks permitted the strip search is dubious, as it rests on the questionable premise that more intrusive searches can be predicated upon prior unrevealing searches. T.L.O. makes clear that such bootstrapping is impermissible; there, the Court validated the escalating search only because additional evidence continued to emerge. See 469 U.S. at 347 (discovery of rolling papers "justified further exploration of T.L.O.'s purse"; evidence of drug dealing justified expansion of search to separate zippered compartment; discovery of "list of people who owe me money" justified reading letters found in zippered compartment). Finally, there is no evidence that Herring or Sirmon knew about prior instances of other students concealing money in their clothing.[12] Thus, because arguable reasonable suspicion was missing, qualified immunity is inappropriate.[13]

---

[12]Appellees point to clothing searches in other schools, and to searches of shoes and socks allegedly conducted by Nelson, but Herring and Sirmon were unaware of these incidents when they conducted the strip search. Further, it is not clear that, on summary judgment, we can assume that Nelson's searches ever occurred, as the Department of Education's Incident Report found that, in prior school theft incidents, no one had ever been required to remove any article of clothing.

[13]I believe that the majority errs by failing to consider whether there was reasonable suspicion to initiate each of the bathroom searches and by treating the searches as a single search justified at its inception. Ante at 19 n.4. Each search was separate in time and place and several different people conducted them. For instance, the backpack search was performed solely by Fannin in her classroom, and was not revealed to Herring or Sirmon, who conducted the later bathroom searches.
Further, I differ with the majority's apparent contention that T.L.O. requires only a one-time assessment of reasonable suspicion where searches are escalating in nature. Id. T.L.O. in fact commands a contrary conclusion -- it condoned an escalating search only where discovered evidence created suspicion to look elsewhere.

In addition, the scope of the strip search far exceeded what T.L.O. allows. To evaluate the scope of a search, T.L.O. directs us to consider several factors: whether there was a reasonable relationship between the means by which a student is searched and the objectives for that search; the intrusiveness of the search in light of the student's age and sex; and the intrusiveness of the search in light of the nature of the alleged infraction. Admittedly, age and sex are not particularly instructive in the present case.[14] Nevertheless, this does not render T.L.O. unclear for qualified immunity purposes. Our cases confirm that a balancing test may establish the law for a specific set of

---

[14]Sex is irrelevant because the students were of the same gender as their searchers; however, the suggestion that T.L.O. is unclear because it does not explain "whether the search of a boy or girl is more or less reasonable," ante at 16, only confuses the issue. Gender is a concern, obviously, when searches are conducted by members of the opposite sex. As for age, the T.L.O. Court did not explain whether older or younger students can be searched more freely. See Cornfield, 991 F.2d at 1321 (discussing issue).

I cannot subscribe to the majority's view, ante at 19 n.4, that this search was reasonable in scope because eight-year-olds are prepubescent and frequently require assistance in the bathroom. Physical maturity is an elusive and, in my view, unworkable constitutional standard and is by no means the only consideration relevant to intrusiveness. See generally Steven F. Shatz et al., The Strip Search of Children and the Fourth Amendment, 26 U.S.F.L. REV. 1 (1991) (child's ability to consent, propensity to commit crime, and degree of body autonomy determine intrusiveness). Moreover, there is nothing in this record to support the majority's factual premises, and pediatric literature suggests that they are questionable. See Marcia E. Herman-Giddens et al., Secondary Sexual Characteristics and Menses in Young Girls Seen in Office Practice: A Study from the Pediatric Research Office Settings Network, 99 PEDIATRICS 505 (1997) (noting that girls often develop pubertal characteristics by age 8, depending on racial and ethnic background); Sally Squires, Bed-Wetting a Common Inconvenience, WASH. POST, Apr. 8, 1997, at Z17 ("Most children are toilet-trained sufficiently to stay dry during the day by age 3 or 4. . . .").

facts when the "balancing would lead to the inevitable conclusion that the [particular conduct] was unlawful." Dartland v. Metropolitan Dade County, 866 F.2d 1321, 1323 (11th Cir. 1989). Because the type of search employed here was not reasonably related to its objectives and was excessive in light of the nature of the infraction, the T.L.O. balance inevitably marks Herring and Sirmon's conduct as unconstitutional, thereby clearly establishing the law.[15]

The strip searches were not reasonably related to their objectives because they were excessively intrusive and unlikely to turn up evidence, and because other reasonable, minimally intrusive options were available.

> It is axiomatic that a strip search represents a serious intrusion upon personal rights. In Mary Beth G. [v. City of Chicago, 723 F.2d 1263, 1272 (7th Cir. 1983)], the court referred to strip searches as "demeaning, dehumanizing, undignified, humiliating, terrifying, unpleasant, embarrassing, repulsive, signifying degradation and submission."

Justice v. City of Peachtree City, 961 F.2d 188, 192 (11th Cir. 1992).[16] Thus, for a strip search to be reasonably related in

---

[15]The majority notes that Justice Stevens objected to T.L.O.'s lack of clarity, ante at 20 n.5; he also realized, however, that its test would lead to some inescapable conclusions: "One thing is clear under any standard--the shocking strip searches that are described in some cases have no place in the schoolhouse. To the extent that deeply intrusive searches are ever reasonable outside the custodial context, it surely must only be to prevent imminent, and serious harm." 469 U.S. at 382 n.25 (Stevens, J., concurring in part and dissenting in part) (emphasis added) (citations omitted).

[16]Although decided after the events at issue in the present case, Justice's treatment of strip searches merely confirms their self-evidently intrusive character.

12

scope to the objectives for which it was undertaken, the objectives must be weighty,[17] and the search must be necessary to locate the suspected evidence.  See Terry, 392 U.S. at 29-30 (search must be "confined in scope to an intrusion reasonably designed to discover" items sought and "confined . . . strictly to what was minimally necessary" to locate those items).  Here, acting only on the discredited testimony of one student and the contradictory allegations of the three suspects (exacerbated by threats that the police would be called to investigate), the teachers launched a full-scale strip search of two eight-year-olds, foregoing several reasonable, yet minimally intrusive, intermediate steps.

Fannin never questioned whether the money was truly stolen. She did not inquire whether the money might have been spent or misplaced, nor did she ask how Estell knew that Jenkins took the money.  Fannin also did not search Jenkins's bag.  Further, Herring took over the situation without asking any questions, and promptly ordered a search of the students' shoes and socks, followed by a strip search, even though there was absolutely no

---

[17]See Cornfield, 991 F.2d at 1321 ("[A]s the intrusiveness of the search of a student intensifies, so too does the standard of Fourth Amendment reasonableness.  What may constitute reasonable suspicion for a search of a locker or even a pocket or pocketbook may fall well short of reasonableness for a nude search."). A sliding scale of reasonableness is inherent in the Fourth Amendment.  Terry, for example, teaches that "[t]he scope of the search must be 'strictly tied to and justified by' the circumstances which rendered its initiation permissible."  392 U.S. at 19.  See also, e.g., United States v. McMurray, 747 F.2d 1417, 1420 (11th Cir. 1984) (in customs context, as intrusiveness increases, suspicion necessary to justify search must increase).

13

evidence that the girls might have the money in their underclothing.  Thus, because there was not even reasonable suspicion to believe that the girls possessed contraband, because the teachers ignored less intrusive means, and because the personal invasion was extreme, the first strip search was necessarily disproportionate to its justification.  The second strip search was even more blatantly unconstitutional, as no one could reasonably argue that it was necessary after the fruitless prior search.

Finally, the nature of the infraction here -- a small theft -- is insufficient as a matter of law to permit a strip search. T.L.O. directs us to consider the nature of the infraction because, although keeping order in the school is important, it is not determinative.  Students' privacy rights must be weighed in the balance.  Strip searching a student is permissible only in extraordinary cases, and only to prevent imminent harm.[18]  For example, if school administrators have reasonable suspicion that a student is carrying a gun on his/her person and a "pat-down" confirms this suspicion, a strip search by an administrator of the same sex, strictly limited to finding the weapon, would be permissible.  The theft of $7, although morally reprehensible, poses no threat of physical danger to other students and cannot,

---

[18]See Justice, 961 F.2d at 193 (collecting cases; noting that threat of harm was only permissible reason in case law for strip search of arrestee).

therefore, serve as the basis for a search of this magnitude.[19]

As the Seventh Circuit, faced with a qualified immunity defense following a school strip search, explained:

> It does not require a constitutional scholar to conclude that a nude search of a thirteen-year-old child is an invasion of constitutional rights of some magnitude. More than that: it is a violation of any known principle of human decency. Apart from any constitutional readings and rulings, simple common sense would indicate that the conduct of the school officials in permitting such a nude search was not only unlawful but outrageous under "settled indisputable principles of law."

Doe v. Renfrow, 631 F.2d 91, 92-93 (7th Cir. 1980) (citation omitted), cert. denied, 451 U.S. 1022 (1981). Because Herring and Sirmon flagrantly ignored common sense and, crucially, the Constitution, I would reverse the district court's order granting qualified immunity.

---

[19] See, e.g., Oliver by Hines v. McClung, 919 F. Supp. 1206, 1216-19 (N.D. Ind. 1995) (strip search of seventh graders for $4.50 unconstitutionally unreasonable); State ex rel. Galford v. Mark Anthony B., 433 S.E.2d 41, 49 (W. Va. 1993) (strip search for $100 unconstitutionally unreasonable in scope because no threat of danger); Bellnier v. Lund, 438 F. Supp. 47, 53-54 (N.D.N.Y. 1977) (strip search for stolen $3 unconstitutionally unreasonable, given unparticularized suspicion and "relatively slight danger of the conduct involved").